Alex R. Straus (SBN 321366)
astraus@milberg.com
*Attorney for Plaintiff*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN LLP**
280 S. Beverly Drive, PH Suite
Beverly Hills, CA 90212
Telephone:  (866) 252-0878
Facsimile:   (865) 522-0049

*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RABIA SHAHBAZ, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> FISHER-PRICE, INC. and MATTEL, INC., <br><br> Defendants. | Case No.: _____ <br><br> **CLASS ACTION COMPLAINT SEEKING STATEWIDE OR NATIONWIDE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Rabia Shahbaz ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Fisher-Price, Inc. ("Fisher-Price") and its corporate parent Mattel, Inc. ("Mattel") (collectively, "Defendants") and alleges the following based on personal knowledge as to herself, and as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.    The Fisher-Price Snuga Swings (the "Products" [1]) are a line of inclined infant swings that Defendants have marketed and sold as a suitable environment for safe infant sleep since 2010. In actuality, inclined infant swings, including the Products, are dangerous and unsuitable for infant sleep. In fact, infant swings pose such a significant risk to infants that Defendants were forced to recall the Products on October 10, 2024. Sample images of the Products are included below:



[2] [3]

---

[1] The Products include, but are not limited to, all 21 substantially similar models of the Snuga Swing: My Little Snugakitty™ Cradle 'n Swing, My Little Snugabunny™ Swing, My Little Snugabear Cradle 'n Swing, My Little Snugabear Ballerina Cradle 'n Swing, Safari Dreams Cradle 'n Swing, Moonlight Meadow Swing, Sweet Snugapuppy™ Swing, Deluxe Swing- Surreal Serenity™, Sweet Snugamonkey Swing, Blooming Flowers Swing, Fawn Meadows Deluxe Swing, Peek-a-boo Fox Swing, Dots & Spots Puppy Swing, Snow Leopard Swing, Hearthstone Swing, Baby Raccoon Swing, My Little Snugabunny Cradle 'n Swing, My Little Sweetie™ Deluxe Cradle 'n Swing, My Little SnugaMonkey™ Cradle 'n Swing, My Little Snugapuppy™ Cradle 'n Swing, and My Little Snugabear Cradle 'n Swing.

[2] *Fisher-Price Baby Swing Sweet Snugapuppy Dual-Motion Infant Seat with Music Sounds & Motorized Mobile for Soothing Play Newborns 0+ Months*, Amazon.com, https://www.amazon.com/Fisher-Price-Sweet-Snugapuppy-Dreams-

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

2.      As millions of parents and caregivers know, infant swings, such as the Products at issue in this litigation, provide a safe place to hold an infant and offer a much-needed break from infants' intense need to be rocked and held.

3.      Because infant swings are designed to simulate the soothing movement of being held by a caregiver, it is well-known- and expected by Defendants- that infants will be frequently lulled to sleep during use. In fact, a study by the National Sleep Foundation found that approximately 65% of parents report using the gentle rocking motion from a baby swing to help their infants fall asleep faster, suggesting that a significant portion of parents use swings as a sleep aid for their babies.

4.      Defendants are well-aware that parents are universally seeking safe ways to help their babies fall asleep faster, which is why they have engaged in a multi-channel safety representations and omissions ("Safety Representations and Omissions") which uniformly and intentionally represents to consumers that the Products are safe for infant sleep.

5.      Defendants' Safety Representations and Omissions, detailed *infra* at ¶¶ 68-107 includes various uniform representations on Defendants' official social media channels and authorized retailers' websites. Even the names of the Products—such as "Cradle 'n Swing"—suggest to the reasonable consumer their suitability for infant sleep.

---

Cradle/dp/B01MQM7W6M#:~:text=With%20two%20swinging%20motions%20%28side-to-side%20and%20head-to-toe%29%20and,mirrored%20dome%20for%20your%20snuggle%20bug%20to%20enjoy (accessed October 22, 2024).

[3] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, CPSC.gov, https://www.cpsc.gov/Recalls/2025/Fisher-Price-Recalls-More-than-2-Million-Snuga-Infant-Swings-Due-to-Suffocation-Hazard-After-5-Deaths-Reported (accessed October 22, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

6.      The Safety Representations and Omissions explicitly show consumers that the Products are safe for sleep. For example, Defendants' official YouTube videos state that the Products are "designed for soothing or for short naps."[4] Before their recall, the Safety Representations and Omissions also included images on Defendants' authorized third-party retailer websites showing infants sleeping in the Products. For example, the below images were displayed on Amazon.com:

 

7.      Over the course of decades, Fisher-Price has garnered the trust of parents and caregivers as one of the most recognized manufacturers of products for infants and children. Accordingly, parents and caregivers trust Defendants to truthfully market their products, especially those designed and marketed as suitable for infant

---

[4] *Fisher-Price Cradle 'n Swing User Tips*, YouTube, (Nov. 6, 2015) https://youtu.be/WUecSoOOXnY?si=5V4W3QpU2EGEHfyM&t=62          (accessed October 21, 2024).

[5] *Fisher-Price Baby Swing Sweet Snugapuppy Dual-Motion Infant Seat with Music Sounds & Motorized Mobile for Soothing Play Newborns 0+ Months*, Amazon.com, https://www.amazon.com/Fisher-Price-Sweet-Snugapuppy-Dreams-Cradle/dp/B01MQM7W6M#:~:text=With%20two%20swinging%20motions%20%28side-to-side%20and%20head-to-toe%29%20and,mirrored%20dome%20for%20your%20snuggle%20bug%20to%20enjoy (accessed October 22, 2024).

[6] *Fisher-Price My Little Snugabunny Cradle 'n Swing Baby Swing*, Pinterest.com, https://www.pinterest.com/pin/568438784196588724/ (accessed October 22, 2024).

sleep. However, Defendants' marketing was dangerously false and misleading, as the Products are not safe for infant sleep.

8.    Defendants know that the safety of infants is paramount for parents, which is why Fisher-Price addresses explicitly its commitment to safety on its official website, claiming:

> **Our Commitment to Safety**
>
> Fisher-Price is committed to building relationships with children and earning the trust of their parents and caretakers. Since our founding, safety has been our highest priority. For more than ninety years, we have maintained an unrelenting focus on product safety, quality, and compliance. We are proud that families and children choose Fisher-Price again and again to make childhood more joyful and support parents through the early months and years of their babies' lives.[7]

9.    Defendant Mattel, Fisher-Price's parent company, employs its own Medical and Scientific Safety Council, "which works closely with Mattel in providing professional opinions, advice and recommendations related to product safety, helping to inform our work and promote safe practices."[8]

10.    However, despite its public commitment to the safety of consumers, the Products at issue suffer from a defect wherein they fail to hold and maintain an appropriately level or flat sleeping surface that is safe and consistent with industry standards and guidance regarding infant sleep ("Defect"). The Defect renders the

---

[7] *Safe Start*, Mattel.com, https://shop.mattel.com/pages/safe-start (accessed October 22, 2024).

[8] https://web.archive.org/web/20240925154947/www.shop.mattel.com/pages/safe-start (Last accessed October 16, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

Products unsafe for infant sleep, inconsistent with reasonable consumer expectations and contrary to Defendants' pervasive Safety Representations and Omissions and capitalizes on the trust Defendants have built with their consumers over the past several decades.

11.    As a result of the Defect, which exists at the point of purchase and is known to Defendants and unknown to consumers at the time of purchase, the Products are unable to conform to the promises and representations made by Defendants through their Safety Representations and Omissions.

12.    Further, the Products are inherently unsafe as an infant swing marketed and sold as suitable for infant sleep and are thus, unfit for its intended use. Indeed, Defendants' Products have led to at least ***five documented infant deaths and injuries***.

13.    Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die.

14.    Defendants' Safety Representations and Omissions have convinced reasonable consumers that the Products can provide a *safe* sleep environment when, in reality, the Products position an infant at a head-to-toe incline. The American Academy of Pediatrics' Updated 2022 Recommendations for Reducing Infant Deaths in the Sleep Environment advise parents to always "[u]se a firm, flat, noninclined sleep surface." [9]

15.    The Defect significantly increases the risk that the infant's head will slip into a dangerous position, tilt to constrict the windpipe, and/or cause the infant's face

---

[9] AAP, "Safe-Related Infant Deaths: Updated 2022 Recommendations for Reducing Infant Deaths in the Sleep Environment," (June 21, 2022) publications.aap.org/pediatrics/article/150/1/e2022057990/188304/Sleep-Related-Infant-Deaths-Updated2022?autologincheck=redirected (Last accessed October 16, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

to become pressed against the padded fabric in the sleeper and block airflow, which the infant may be unable to correct. This increases the risk of death by asphyxiation and makes following requisite safe sleep precautions impossible.

16.    In 2019, after previously concluding that inclined sleep products are hazardous to infants, researchers studied so-called infant "seated products" such as bouncers, swings, and rockers to determine whether these products posed similar risks.[10] They issued a stark warning in 2023, noting that many "seated products" had substantially similar designs to banned inclined sleepers, including the hazardous incline angle.[11]

17.    Like inclined sleepers, the design of the Products can lull infants into a deeper sleep than normal, making it more difficult for them to wake up if their airflow becomes obstructed.

18.    Defendants were keenly aware of these risks for as long as they sold the Products. Even before the product was introduced to the market in 2010, the American Academy of Pediatrics ("AAP") and major consumer groups repeatedly issued warnings about the serious dangers of inclined products marketed and sold for infant sleep, such as the Products at issue in this litigation.

19.    Further, according to Defendants, since 2012, there have been reports of at least *five deaths involving infants 1 to 3 months of age who used the Products for*

---

[10]    Mannen, et al., Seated Products Characterization and Testing 57 (2023), https://www.cpsc.gov/content/Report-Boise-State-Universitys-Seated-Products-Characterization-and-Testing (citing Mannen, et al., Biomechanical Analysis of Inclined Sleep Products (2019), https://www.cpsc.gov/s3fs-public/Dr-Mannen-Study-FINAL-Report-09-18-2019_Redacted.corrected_0.pdf?g.Jao0IN_zU.TjiX4FeSUM3SPc3Zt_25).      (Last accessed October 16, 2024).

[11] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

*sleep*.[12] Yet Defendants ignored these documented safety concerns and intentionally and knowingly marketed and sold the Products to consumers nationwide as a swing suitable for infant sleep.

20.    Finally, on October 10, 2024, after repeated warnings from experts and ***the death of five infants***, Defendants were forced to recall approximately 2.1 million individual Products in the United States, Australia, Canada, and Mexico and cease selling the product ("Recall").[13]

21.    The Recall notice ("Recall Notice"), titled "Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported,"[14] confirms the existence of the dangerous Defect (emphasis added):

> **Hazard:** The swing should **never be used for sleep** … If the product is used for sleep … the headrest and body support insert on the seat pad can **increase the risk of suffocation.**

22.    The Recall Notice further confirms the fact that the Products are completely unsafe for infant sleep (emphasis added):

> **… never use these products for sleep  … even after the headrest and the body support insert have been removed**. Parents and caregivers should never use any inclined seated products, such as swings, gliders, soothers, and rockers, for infant sleep and should not leave infants in these products

---

[12] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, CPSC.gov, https://www.cpsc.gov/Recalls/2025/Fisher-Price-Recalls-More-than-2-Million-Snuga-Infant-Swings-Due-to-Suffocation-Hazard-After-5-Deaths-Reported (accessed October 22, 2024).
[13] *Id.*
[14] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

unsupervised, unrestrained, or with bedding material due to the risk of suffocation.

23.    Even more, through the Recall, Defendants continue to acknowledge that infants should only be put to sleep on flat surfaces and specifically, cite the Safe Sleep for Babies Act,[15] which bans inclined sleepers:

> CPSC continues to urge consumers to place infants on their backs for sleep. **The best place for an infant to sleep is on a firm, flat surface in a crib, bassinet, or play yard, with nothing but a fitted sheet.** Infants who fall asleep in an inclined or upright position should be moved to a safe sleep environment with a firm, flat surface such as a crib, bassinet, or play yard. **In 2022, Congress enacted the Safe Sleep for Babies Act, under which inclined sleepers for infants are banned hazardous products.**

24.    The Recall Notice advises consumers to "immediately remove both the headrest (by cutting the tether) and the body support insert from the seat pad before continuing to use the swing for awake-time activities."[16] Thus, Defendants place the purportedly remedy in the hands of consumers.

25.    According to research and a published report titled "Seated Products Characterization and Testing," conducted by the Consumer Products Safety Commission ("CPSC") in 2019, these pillow-type features in infant sleep products

---

[15] Safe Sleep for Babies Act, , H.R. 3182, 117th Congress (2022), https://www.cpsc.gov/s3fs-public/Trumka-Safe-Sleep-for-Babies-Act-5-16-2022.pdf?VersionId=bU9IFMNp1p2Je4.AwTMOIst5aJXt6ff4
[16] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

can contribute to interfering with the infant's ability to breathe.[17] See an image reflecting this interference below:



26.    Defendants' Recall Notice is poorly designed, ineffective, and inadequate for providing consumers with a meaningful remedy for purchasing the defective Products. Further, implementing the Recall Notice constitutes an unfair and deceptive trade practice.

27.    Defendants offer purchasers a partial refund of $25, although the original price was $160.00. More specifically, the terms of the Recall Notice are set forth on Defendants' websites, as follows:

> You will need to remove the headrest and body support insert (if included) from the seat pad. Follow the instructions here or watch this brief video for information

---

[17] CPSC Staff Statement on Boise State University's, "Seated Products Characterization and Testing," CPSC.gov, page 62, https://www.cpsc.gov/s3fs-public/CPSC-Seated-Products-Report-FINAL.pdf?VersionId=UI.1.6SXqTfedecBi0BwfxrsrAoHtZnD (Last accessed October 16, 2024).

about how to remove and properly destroy the headrest and body support insert (if included) from your swing.

Upload a digital photo of your headrest and body support insert (if included) with your unique case number and the word "RECALL" handwritten in permanent dark-colored marker directly onto the back of each of the cut pieces of the headrest and body support insert (if included).

Photos that have been digitally altered or do not have your unique case number written on the headrest and body support insert (if included) will not be accepted.

28.    However, purchasers who qualify cannot redeem their partial refund until they "remove the headrest and body support insert" and "properly destroy" them according to the Defendants' instructions, take a photo of the headrest and body support insert with their case number and "RECALL" written on the back of the cut pieces, and either upload those photos with the online recall submission form, which also must be completed, found on Defendants' website.[18] These modifications to the Product significantly diminish its value. Moreover, they burden consumers who are already living busy lives caring for their children and are not trained nor experienced in designing infant products, unlike Defendants.

29.    Consumers who own more than one swing—a common occurrence—cannot seek a refund through the website and must take additional steps to contact Fisher-Price for additional service.

---

[18]    *Fisher-Price    Snuga    Infant    Swings*,    Mattel.com, https://consumersupport.mattel.com/mattelsupport/s/recall?recallnumber=Swings (Last accessed October 16, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

30.    The Recall Notice is also inadequate for at least two reasons. First, the Recall Notice is inadequate because *the Defendants failed to recall the entire Product and instead only advised* its consumers to remove certain portions of it. Accordingly, the Recall Notice fails to prevent the risks associated with infant sleep presented by the dangerously defective Product, *contrary to Defendants' Safety Representations and Omissions.* By failing to recall the entire Product, the Recall Notice allows and encourages consumers to continue to use a product that has already led to multiple infant deaths.

31.    Second, the *Recall Notice is wholly ineffective in providing consumers an adequate monetary remedy* for purchasing the dangerously defective and misrepresented Products. Consumers paid an average retail price of $160 for the Products, but Defendants have provided consumers with a $25 reimbursement, representing a mere fraction of the purchase price.

32.    The very same day Defendants issued the Recall Notice, the CPSC Commissioner, Richard L Trumka, Jr. issued the statement, "Commissioner Trumka Warns That Fisher-Price's Snuga Recall Notice Is Not Good Enough to Keep Babies Safe; Multiple Babies Dead."[19] Commissioner Trumka explained that Defendants' Recall Notice is inadequate as follows (emphasis added):

> I absolutely agree that Fisher-Price Snuga Swings need to be recalled—they are tied to multiple infant sleep deaths. However, **I believe that the flawed recall that Fisher-Price**

---

[19] *Commissioner Trumka Warns That Fisher-Price's Snuga Recall Is Not Good Enough to Keep Babies Safe; Multiple Babies Dead*, CPSC.gov, https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/Commissioner-Trumka-Warns-That-Fisher-Price%E2%80%99s-Snuga-Recall-Is-Not-Good-Enough-to-Keep-Babies-Safe-Multiple-Babies-Dead (Last accessed October 16, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

1    **is announcing today is doomed to fail and will keep many**
2    **babies in harm's way.**

3    33.    Commissioner Trumka continues to express the same concerns detailed
4    above about the inadequate Recall Notice (emphasis in original):

5    First, Fisher-Price fails to recall the entire product, instead
6    recalling only a portion of it. Even after a consumer follows
7    through with the recall "remedy," the product remains
8    **unsafe** for infant sleep, yet Fisher-Price encourages
9    "continuing to use the swing." Second, along with choosing
10    to recall only a portion of the product, Fisher-Price is
11    offering consumers only a small portion of the product's
12    cost—$25, when consumers originally spent around $160
13    for the Snuga Swings.

14    34.    Commissioner Trumka further states that he fears "this dangerous
15    approach will keep babies at risk of death just to save Fisher-Price money—**a**
16    **horrible example of putting profit over people**."[20]

17    35.    Echoing Commissioner Trumka's serious concerns with the Recall,
18    consumer advocates expressed similar doubts about the Recall's effectiveness.

19    36.    For example, Consumer Reports released an article on the same day,
20    October 10, 2024. They stated, "CR's safety experts welcome the recall because it's
21    now illegal for anyone to sell any Snuga Swing listed in today's announcement. But
22    they also say the recall doesn't go far enough to help families protect their children
23    and ensure that consumers are made whole for spending money on a product that
24    turned out to be hazardous."[21]

25

26    [20] *Id.*
27    [21] *Over 2 Million Fisher-Price Snuga Baby Swings Recalled for Suffocation Risk*,
28    ConsumerReports.com, https://www.consumerreports.org/babies-kids/baby-product-

37.    According to Consumer Reports, "Mattel, Fisher-Price's parent company, didn't answer CR's questions about criticisms of its recall but stated that the full swing isn't being recalled and that parents may continue to use it, just not for infant sleep."[22] This is unacceptable, as noted by the CPSC Commissioner and Consumer Reports.

38.    The existence of the Defect is a material fact that reasonable consumers, including Plaintiff and Class Members, would have considered when deciding whether to purchase the Snuga Swing. Before purchasing the Products, they did not know that the Products had the Defect and that, contrary to Defendants' Safety Representations and Omissions, using the Products for their intended and foreseeable purpose would place their infant children in unreasonably dangerous sleeping positions and compromise their safety.

39.    According to Defendants, since at least October 2010 to January 2024, they have sold the Product to approximately 2.1 million consumers who purchased the Products in reliance on Defendants' representations, including the Safety Representations and Omissions alleged herein, and which became part of the basis of their bargain with Defendants.[23] Defendants were well aware that if they truthfully informed consumers of the dangers of allowing infants to sleep in the Products, it would significantly impact their sales.

---

[22] recalls/fisher-price-snuga-baby-swings-recalled-for-suffocation-risk-a2341467743/?msockid=19f2d5f7732f63fe1135c60c725462ca (Last accessed October 22, 2024).
[22] *Id.*
[23] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, CPSC.gov, https://www.cpsc.gov/Recalls/2025/Fisher-Price-Recalls-More-than-2-Million-Snuga-Infant-Swings-Due-to-Suffocation-Hazard-After-5-Deaths-Reported (accessed October 22, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

40.    Prior to the Recall, the Products were sold in brick-and-mortar stores such as Toys R Us, Walmart, Sams Club, and Target, as well as major online authorized retailers' websites, including Amazon.com, Walmart.com, and Target.com nationwide.[24] The base retail pricing of the Products was approximately $160.[25]

41.    Due to Defendants' Safety Representations and Omissions, Plaintiff and all reasonable consumes expected the Products to be suitable for infant sleep and paid a premium for that important quality. Defendants can charge this premium price for the Products due to the Safety Representations and Omissions, as Defendants know that safety and suitability for infant use, which naturally (and foreseeably) includes sleep, is paramount for consumers.

42.    Given the nature of the Products, studies have shown that consumers are willing to pay more for a baby product that is marketed as safe. For example, the latest market report conducted by Transparency Market Research, a business consulting firm, revealed that "[m]anufacturers of baby care products are focusing more on quality and innovation as parents are willing to pay more for high quality and safe baby care products. Furthermore, aggressive marketing strategies of companies through online and offline advertising, and various promotional activities are substantially driving the global baby care products market."[26]

43.    Defendants' false and misleading marketing of these dangerous Products, and knowing failure to disclose the grave risks of allowing infants to sleep in the Products, allowed Defendants to reap vast profits at the expense of consumers who erroneously believed they were giving their babies a safe place to be soothed to sleep.

---

[24] *Id.*
[25] *Id.*
[26] Baby Care Products Market Outlook 2031, Transparencymarketresearch.com, https://www.transparencymarketresearch.com/baby-care-products-market.html (accessed May 6, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

44.     Every Product suffers from the uniform Defect, which, unknown to consumers but known to Defendants, exists at the point of purchase and poses an unreasonable safety hazard to infants. As such, Plaintiff and all reasonable consumers are victims of the unfair bargaining power between them and the Defendants based on Defendants' superior industry knowledge.

45.     Had Plaintiff and Class Members known about the Defect at the time of purchase and the associated fatal risks of unsafe sleeping conditions caused by the Defect, they would not have purchased the Product or would have paid less for it.

46.     Plaintiff, on behalf of herself and Class Members, seeks damages and all other relief available under law and equity from Defendants, including punitive damages for their appalling and unconscionable misconduct. Plaintiff also seeks classwide injunctive relief, including: (i) a state-of-the-art notice program for the wide dissemination of a factually accurate recall notice for the Products; (ii) the implementation of a corrective advertising campaign to alert caregivers to the dangers of inclined swings marketed for infant sleep, including the Products, and educating them about the standards for safe infant sleep; and/or (iii) an offer to replace the Products with a reasonable and safe infant product.

47.     Plaintiff Rabia Shahbaz and the putative Class put Defendants on direct notice of their claims by a certified letter dated October 23, 2024.

## PARTIES

### PLAINTIFF

48.     At all relevant times, Plaintiff Rabia Shahbaz has resided in Sacramento County, California and is a citizen of California. Plaintiff Shahbaz purchased a Sweet Snugapuppy™ Swing in or around 2021 from Amazon.com for approximately $170.00. Prior to her purchase, Ms. Shabaz read and relied on Defendants' advertising and marketing materials, including the Safety Representations and Omissions alleged herein, which she understood to mean the Product was a safe and

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

suitable environment for infants to sleep in. Ms. Shahbaz would not have purchased or used the Sweet Snugapuppy™ Swing had she known that it was unsafe for its intended, marketed and/or reasonably foreseeable use; dangerous; and exposed her baby to the risk of injury and death.

49. Ms. Shahbaz was forced to completely discontinue her use of the Product shortly after her purchase when the Defect was discovered due to the ongoing safety risk of placing her infant in an unsafe sleeping environment.

50. To the best of her knowledge, Ms. Shahbaz did not receive a Recall Notice from Defendants. However, if she had, she would not have been made whole by the $25.00 partial refund because it is an inadequate remedy. The purported solution to the defective Products is insufficient and has diminished the valued of the Products.

## DEFENDANTS

### Fisher-Price, Inc.

51. Defendant Fisher-Price is a Delaware corporation with its principal place of business in East Aurora, Erie County, New York. Fisher-Price designs, manufactures, distributes, markets, advertises, labels, and sells products for the care of infants and preschool children to consumers throughout the United States, including in California.

52. Fisher-Price is a wholly-owned subsidiary of Mattel. The website on which Defendants advertised their Snuga Swings includes Mattel's name: https://fisher-price.mattel.com.

### Mattel, Inc.

53. Defendant Mattel is a Delaware corporation with its principal place of business in El Segundo, California. Mattel is the world's second-largest toy maker and the corporate parent of Fisher-Price. On its annual filings with the Securities

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

Exchange Commission, Mattel references Fisher-Price as a "brand" in "Mattel's portfolio of iconic brands."[27]

54.    Until January 2024, Mattel directly and/or through Fisher-Price designed, manufactured, distributed, marketed, advertised, labeled, and sold Snuga Swings in all 50 states.

55.    Mattel shares overall responsibility for the safety of Fisher-Price products, including the Snuga Swings. All recall notices and safety alerts for both Fisher-Price and Mattel products, as well as customer service for both Fisher-Price and Mattel products, are found on the Mattel website.[28] Mattel has always had significant involvement in and responsibility for the wrongful conduct alleged herein.

56.    Mattel wholly owns Fisher-Price and includes its results on its filings with the SEC. For example, Mattel's 10-Q, ending July 30, 2024, contains a statement about litigation pending against Mattel and Fisher-Price concerning the Rock 'n Play Sleeper, including it among contingencies that could impact Mattel's financial results.[29] On Mattel's financial filings, it describes Fisher-Price as a "brand," part of the "Infant, Toddler, and Preschool Segment" represented in Mattel's gross sales.[30]

57.    Mattel, at all relevant times, had senior executives with control over, involvement in and oversight of Fisher-Price, with titles such as "Executive Vice President – Fisher-Price Global Brands," and "Executive Vice President - Fisher-

---

[27] See, e.g., Mattel, Inc., 2018 10-K, at 4 (February 21, 2023), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000063276/a8e997d5-5ae2-4b5b-be6c-54db4ce61f91.pdf

[28] https://consumersupport.mattel.com/mattelsupport/s/recall?recallnumber=Swings

[29] Mattel, 10=Q, 2Q 2024 at 23, https://s201.q4cdn.com/696436908/files/doc_financials/2024/q2/917703eb-e43f-41a2-8060-121813d902fc.pdf

[30] Id.

Price Global Brand Marketing." For example, Bryan Brown, Mattel's Vice President of Quality, Design, and North American Manufacturing, held various positions in which he had oversight of and involvement in addressing issues concerning the Products.

58.    Moreover, in 2013, Mattel moved 100 Fisher-Price employees from Fisher-Price's headquarters in East Aurora to Mattel's headquarters in El Segundo.[31] Some Fisher-Price executives are located in and primarily work from California. As a former Fisher-Price executive stated in Buffalo Business First, "much of the leadership has been shifted to El Segundo, the Los Angeles suburb where Mattel is located."[32]

59.    Moreover, the instruction manuals for the Products were posted on Mattel's website.[33]

60.    Mattel bears responsibility for failing to recall the Products in a timely manner and for the inadequate recall. Mattel was directly involved in all recalls of Fisher-Price products.

61.    When the Recall Notice of all 2.1 million Products finally occurred, the announcement of the Recall Notice on the CPSC's website stated the consumer contact for information about the Recall Notice was "Fisher-Price … **online at www.service.mattel.com**...." (Emphasis added.) The terms of the Recall Notice are set forth on Mattel's website.

62.    Mattel's annual net sales were approximately $5.43 billion in 2022.[34] On information and belief, revenue from Fisher-Price flows upstream to Mattel.

---

[31] https://labusinessjournal.com/news/weekly-news/toymaker-game-bring-staff-hq-el-segundo/

[32] https://www.bizjournals.com/buffalo/news/2017/12/22/toy-story-fisher-price-faces-many-challenges.html

[33] m.service.mattel.com/us/Technical/productDetail?prodno=CMR45&siteid=27

- 19 -

63.    Mattel's corporate headquarters is here, and California is the nerve center of Defendants' actions (and inactions) subject to this litigation. Mattel is a citizen of California.

## JURISDICTION AND VENUE

64.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (2) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (3) there is diversity because Plaintiff Shahbaz and at least one Defendant are citizens of different states.

65.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

66.    This Court has personal jurisdiction over Defendants because Defendants do substantial business in this State and within this District, receive substantial compensation and profits from the marketing, distribution, and sale of products in this District, and have engaged in the unlawful practices described in this Complaint within this District.

67.    In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, Defendants regularly transact business in this District, and Defendants have intentionally availed themselves of the laws and markets within this District. Also, Defendant Mattel is headquartered here, making this venue the nerve center of this litigation.

## COMMON FACTUAL ALLEGATIONS

### *Defendants' Deceptive and Misleading Safety Representations and Omissions*

---

[34]    https://d18rn0p25nwr6d.cloudfront.net/CIK-0000063276/a8e997d5-5ae2-4b5b-be6c-54db4ce61f91.pdf

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

68.     Defendants' multi-channel Safety Representations and Omissions includes promises made directly to consumers about the Products' safety and suitability for infant sleep. Defendants' representations include statements in videos posted to Defendants' official YouTube page and on authorized retailers' websites.

69.     These representations even include names of the Products themselves, such as the "Cradle 'n Swing,"[35] which communicates to reasonable consumers that the Products may be used not just as a swing or a seat but as a *cradle*, which leads reasonable consumers to conclude that the Products are suitable for infant sleep reasonably.

70.     Defendants' promises include affirmative representations in their video advertising on their official YouTube channel. These advertisements represent that the Products are "designed for soothing or for *short naps*."[36]

71.     Further, Defendants' Safety Representations and Omissions includes clear visual representations of infants sleeping in the Products on its authorized retailer's websites, such as Amazon.com as demonstrated below:

---

[35]                    https://www.amazon.com/Fisher-Price-Sweet-Snugapuppy-Dreams-Cradle/dp/B01MQM7W6M#:~:text=With%20two%20swinging%20motions%20%28side-to-side%20and%20head-to-toe%29%20and,mirrored%20dome%20for%20your%20snuggle%20bug%20to%20enjoy.

[36] *Fisher-Price Cradle 'n Swing User Tips*, YouTube, (Nov. 6, 2015) https://youtu.be/WUecSoOOXnY?si=5V4W3QpU2EGEHfyM&t=62         (accessed October 21, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF



37

\* \* \*

38

37 https://www.amazon.com/Fisher-Price-Sweet-Snugapuppy-Dreams-Cradle/dp/B01MQM7W6M
38 https://www.pinterest.com/pin/568438784196588724/

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

72.    Even more, while Defendants could have issued a warning in the user manual cautioning against using the Products for infant sleep at any time, they instead caution only against using the Products for *prolonged* periods of sleep.[39] This limited warning further demonstrates that Defendants knew and expected that consumers would foreseeably use the Product for infant sleep, despite Defendants' knowledge of the attendant risks of such use. See the warning in the Product user manual below:[40]



⚠ **WARNING**

**Prevent death:** Keep seat fully reclined until child is at least 4 months old **AND** can hold head up without help. Young infants have limited head and neck control. If seat is too upright, infant's head can drop forward and compress the airway, resulting in DEATH.
**Prevent serious injury or death from falls or strangling in the restraint system:**
• Never leave child unattended.
• This product is not intended to replace a crib or bassinet for prolonged periods of sleep.
• Always use the restraint system.
• Discontinue use of product when infant attempts to climb out (approximately 9 months).

73.    Defendants know that safety is the chief concern of parents and caregivers, which is why Defendants' Safety Representations and Omissions, which include affirmative representations about the Products' intended use and ability to provide a safe sleep space for infant children, are intentionally designed to deceive reasonable consumers to pay a premium for the Products.

**Defendants Claim to Be a Baby Products Brand Dedicated to Safety**

74.    As described below, for over 90 years, Fisher-Price has garnered consumers' trust by marketing its products as good quality baby products, which are, above all, *safe*.

75.    Fisher-Price states that it is the "#1 infant and preschool company in the world" and "the only kid brand committed to all the years between 0 and 5."[41]

---

[39] https://m.media-amazon.com/images/I/A1Qm1C6kM1L.pdf
[40] *Id.*
[41] https://corporate.mattel.com/brand-portfolio/fisher-price (Last accessed October 15, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

76.    Fisher-Price was founded in 1931 by Herman Fisher, Irving Price & Helen Schelle.[42] Since its small beginnings, the company has evolved significantly and merged into Mattel through a $1-billion merger in 1993.[43]

77.    Fisher Price consistently misleads consumers of Products by making safety a central component of its brand image.

78.    For example, up until at least July 2019, Defendant Fisher-Price had a webpage dedicated to safety.[44] This page, titled "A Safety Story," states:

**It All Starts With Safety**

Squeals of delight, sighs of contentment, giggles of joy . . . those are some of the reactions we hope for from families using our babygear and toys. There's a less visible one, too: peace of mind. "Parents have trusted us for more than 80 years to provide safe products for their children, but we know we must still earn their trust every day," says Kitty Pilarz, Vice President of Product Safety & Regulatory Compliance at Fisher-Price. 'So, right from the start of a design concept, we work to make sure our products are as safe as they can be.'

**To standards and beyond**

There's an entire team of quality engineers who work closely with design groups to make sure every product not only meets U.S. safety regulations and international standards, but lives up to the traditionally high Fisher-Price standards of

---

[42] *Id.*

[43]   https://www.latimes.com/archives/la-xpm-1993-08-20-mn-25728-story.html  (Last accessed October 15, 2024).

[44]https://web.archive.org/web/20190729085651/https://www.fisher-price.com/en_US/ourstory/safety/index.html (accessed October 22, 2024).

1    quality, as well as consumer expectations. A significant

2    amount of testing is done all along the way.

3    79.    This is false because the Products are not "as safe as they can be," and

4    instead are dangerous for sleep, the purpose for which they are advertised.

5    80.    Today, Defendant Fisher-Price has a similar webpage dedicated to safety

6    that employs analogous messages about its brand's "commitment to safety" to market

7    its products to consumers and grow its wealth without regard for the truth:[45]

8    **Our Commitment to Safety**

9    Fisher-Price is committed to building relationships with

10    children and earning the trust of their parents and caretakers.

11    Since our founding, safety has been our highest priority. For

12    more than ninety years, we have maintained an unrelenting

13    focus on product safety, quality, and compliance. We are

14    proud that families and children choose Fisher-Price again

15    and again to make childhood more joyful and support parents

16    through the early months and years of their babies' lives.

17    81.    The overarching message on Defendant Mattel's website is also safety.

18    As shown below, the website states that the most important part of creating its

19    products is ensuring they are safe and that its internal product safety procedures are

20    designed to meet or exceed applicable regulations and laws.[46]

21
22    **Product Quality and Safety**

23    Product quality and safety are key to the bedrock of trust we

24    establish with millions of families who buy and play with

25

26    ───────────────

27    [45] *Safe Start,* Mattel.com, https://shop.mattel.com/pages/safe-start (accessed October
22, 2024).

28    [46] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

our products every day. The development and construction of new products involves numerous disciplines and multiple areas of expertise devoted to ensuring the quality and safety of our products before they go to market, as well as ensuring they meet or exceed all applicable standards.

82.    Mattel even details the "Five Phases of Product Safety" on its website to further persuade consumers to trust their brand and rely on them to deliver quality and safe infant products for their children.[47]

83.    Parents' trust is essential for Defendants' success. Defendants advertise their commitment to safety by ensuring their products comply with all safety standards.

84.    Specifically, in 2019 and in response to the recall of the Fisher-Price Rock-n-Play Sleepers, Chuck Scothon, General Manager of Fisher-Price stated, "we want parents around the world to know that safety will always be a cornerstone of our mission, that we are committed to these values, and will continue to prioritize the health, safety and well-being of the infants and preschoolers who utilize our products."[48]

85.    Defendant Mattel further contributes to consumer perception that it is a maker of safe products through its own branding. Defendant Mattel promises that it is "committed to building relationships with parents and earning their trust."[49]

---

[47] *Product Quality and Safety,* Mattel.com, https://corporate.mattel.com/product-quality-and-safety (accessed October 22, 2024).

[48] *Fisher-Price Rock 'n Play sleepers recalled as officials confirm over 30 infant deaths*, CNN.com, https://www.cnn.com/2019/04/12/us/fisher-price-rock-n-play-sleeper-recall/index.html (accessed October 22, 2024).

[49] https://web.archive.org/web/20240925154947/www.shop.mattel.com/pages/safe-start (accessed October 16, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

86.    Specifically, Defendant Mattel formed its own Medical and Scientific Safety Council, "which works closely with Mattel in providing professional opinions, advice and recommendations related to product safety, helping to inform our work and promote safe practices."[50]

87.    All of this marketing makes sense from a business perspective because of the incredibly high importance consumers put on safety when choosing to purchase baby products, like Defendants' Products.

88.    Mattel and Fisher-Price know this because they are industry leads in the baby products' marketing. As such, they possess knowledge and information that reasonable consumers do not possess. As alleged throughout this Complaint, Defendants used that knowledge and sought to capitalize on Plaintiff and reasonable consumers through the Safety Representations and Omissions.

89.    As a result of Defendants' decades-long marketing scheme, including the Safety Representations and Omissions alleged herein, consumers recognize the Fisher-Price and Mattel brands as reliable sources for safe infant products. Consequently, these consumers reasonably rely on Defendants to produce *safe*, reliable infant products.

**Defendants Know that Back is Indisputably Best for Safe Infant Sleep, but its Products Cannot Conform to this Requirement.**

90.    Defendants are keenly aware of the fact that safe sleep is a top priority for parents and acknowledge explicitly that infants should sleep on their backs on a flat and firm sleeping surface in the Recall[51]:

---

[50]    https://web.archive.org/web/20240925154947/www.shop.mattel.com/pages/safe-start (accessed October 16, 2024).

[51]    *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, CPSC.gov, https://www.cpsc.gov/Recalls/2025/Fisher-Price-Recalls-More-than-2-Million-

CPSC continues to urge consumers to place infants on their backs for sleep. **The best place for an infant to sleep is on a firm, flat surface in a crib, bassinet, or play yard, with nothing but a fitted sheet.** Infants who fall asleep in an inclined or upright position should be moved to a safe sleep environment with a firm, flat surface such as a crib, bassinet, or play yard. **In 2022, Congress enacted the Safe Sleep for Babies Act, under which inclined sleepers for infants are banned hazardous products.**

91.    Contrary to Defendants' promises to consumers that the Products are a safe sleep environment for infants, the Defect in the Products renders them completely unsuitable for infant sleep *__at all__*.

92.    Per the recommendation of the CPSC, AAP, NICHD, and the U.S. Surgeon General, infants should be put to sleep on their backs instead of their stomachs or sides.

93.    Specifically, the CPSC instructs parents to "[a]lways place the baby to sleep on their back to reduce the risk of sudden unexpected infant death syndrome (SUID/SIDS) and suffocation."[52]

94.    In 1992, the AAP issued the recommendation that babies should sleep on their backs or sides to reduce the risk of SIDS.[53] Specifically, the AAP stated that

---

Snuga-Infant-Swings-Due-to-Suffocation-Hazard-After-5-Deaths-Reported (accessed October 22, 2024).

[52] *CPSC Urges Parents/Caregivers to Use Products that Are Safe for Sleep; Check Baby's Sleep Space for Suffocation Hazards; Most Nursery Product-Related Infant Deaths Can Be Prevented*, CPSC newsroom, (Sept. 15, 2022) https://www.cpsc.gov/Newsroom/News-Releases/2022/CPSC-Urges-Parents-Caregivers-to-Use-Products-that-Are-Safe-for-Sleep-Check-Babys-Sleep-Space-for-Suffocation-        Hazards-Most-Nursery-Product-Related-Infant-Deaths-Can-Be-Prevented (accessed October 22, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

"[b]ased on careful evaluation of existing data indicating an association between [SIDS] and prone [front] sleeping position for infants, the Academy recommends that healthy infants, when being put down for sleep, be positioned on their side or back."[54]

95.    On June 21, 1994, the U.S. Surgeon General, Joycelyn Elders, M.D., issued a policy statement that healthy infants should be placed on their back or side to sleep to reduce the risk of SIDS.[55]

96.    The same year, the NICHD launched the "Back to Sleep" campaign with collaborators including the AAP, the SIDS Alliance, the Association of SIDS and Infant Mortality Programs (ASIP), the National Heart, Lung, and Blood Institute (NHLBI), and the Maternal and Child Health Bureau of the Health Resources and Services Administration (HRSA).[56]

97.    The AAP updated 2022 Recommendations for Reducing Infant Deaths in the Sleep Environment advise "[t]o reduce the risk of sleep-related death, it is recommended that infants be placed for sleep in a supine (back) position for every sleep by every caregiver until the child reaches 1 year of age. Side sleeping is not safe and is not advised."[57]

---

[53] AAP TASK FORCE ON SUDDEN INFANT DEATH SYNDROME, *Positioning and SIDS* 89 Pediatrics 6 (1992), https://publications.aap.org/pediatrics/article-abstract/89/6/1120/57959/Positioning-and-SIDS?redirectedFrom=fulltext (accessed October 22, 2024).

[54] *Id.*

[55] *Key Moments in Safe to Sleep® History: 1994–2003*, NATIONAL INSTITUTES OF HEALTH, https://safetosleep.nichd.nih.gov/safesleepbasics/moments/1994-2003 (accessed October 22, 2024).

[56] *Id.*

[57] AAP, "Safe-Related Infant Deaths: Updated 2022 Recommendations for Reducing Infant Deaths in the Sleep Environment," (June 21, 2022) publications.aap.org/pediatrics/article/150/1/e2022057990/188304/Sleep-Related-Infant-Deaths-Updated2022?autologincheck=redirected (accessed May 6, 2024); *See Safe Sleep*, *AAP.ORG*, https://www.aap.org/en/patient-care/safe-sleep/ (accessed October 22, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

98.     The AAP, CPSC, NICHD and U.S. Surgeon General have made these recommendations because studies show that the risk of SIDS increases when infants sleep facing downward in a prone position.[58]

99.     In addition to placing babies on their backs to sleep, the CPSC and AAP recommend that infant sleep products conform to the Firm/Flat Standard so that infants can effectively *remain* on their backs and not roll to their sides or fronts until developmentally appropriate.[59]

100.    Like the CPSC and AAP, NICHD also recommends that parents and caregivers can "reduce [their] baby's risk for Sudden Infant Death Syndrome (SIDS) and other sleep-related deaths, such as from accidental suffocation" by using a "firm, flat, and level" sleep surface.[60]

101.    Moreover, the Center for Disease Control ("CDC") recommends that parents and caregivers "[u]se a firm, flat (not at an angle or inclined) sleep surface."[61]

---

[58] Mitchell EA, et al. *Changing Infants' Sleep Position Increases Risk of Sudden Infant Death Syndrome. New Zealand Cot Death Study*. Arch. Pediatr. Adolesc. Med., 153(11):1136-41. (1999), https://pubmed.ncbi.nlm.nih.gov/10555714/ (accessed October 22, 2024).

[59] *See supra* ¶¶ 15-16. *See also CPSC Approves Rules Implementing Bans on Inclined Sleepers for Infants and Crib Bumpers Rules Aim to Save Lives and Result in a Safer Marketplace for Parents and Babies*, (August 7, 2023) https://www.cpsc.gov/Newsroom/News-Releases/2023/CPSC-Approves-Rules-Implementing-Bans-on-Inclined-Sleepers-for-Infants-and-Crib-Bumpers (accessed October 22, 2024).

[60] *What Does A Safe Sleep Environment Look Like?*, NIH.GOV, (August 2022) NIH Pub. No. 22-HD-5759, https://safetosleep.nichd.nih.gov/resources/caregivers/environment/look (accessed October 22, 2024).

[61] *Parents and Caregivers, Sudden Unexpected Infant Death and Sudden Infant Death Syndrome*, CDC.GOV, https://www.cdc.gov/sids/parents-caregivers.htm (accessed October 22, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

102.   John Hopkins Medicine also instructs parents that "[b]abies should sleep on a firm, flat surface. Don't use one that is at an angle or inclined" and "Your baby should sleep on a firm, flat mattress or firm surface with no slant."[62]

103.   When babies sleep on their stomachs, their mouths and noses are more likely to be obstructed by the Sleeping Surface and soft materials in the sleeping environment that can conform to their faces.[63] This can obstruct breathing through the mouth and nose or force the infant's head into a position that restricts air flow through the esophagus.[64] See the below image demonstrating the dangers of tummy sleeping from the Safe Sleep page on Everybabyto1.org.[65]

## Place Babies on their Backs to Sleep.





---

[62]     *Infant Safe Sleep*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/wellness-and-prevention/infant-safe-sleep (accessed October 22, 2024).

[63] *Id.*

[64] Moon, Rachel Y. et al, AAP TASK FORCE ON SUDDEN INFANT DEATH SYNDROME. *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment*, 138 Pediatrics 5 (2016), https://publications.aap.org/pediatrics/article/138/5/e20162938/60309/SIDS-and-Other-Sleep-Related-Infant-Deaths-Updated?autologincheck=redirected (accessed October 22, 2024).

[65]     Safe Sleep, EVERYBABYTO1.ORG, https://www.everybabyto1.org/wp-content/uploads/2021/07/ENGLISH_EB1_SafeSleep_AatomicalDiagram-2021-rgb-01-1024x522.jpg (accessed October 22, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

104.   Approximately 3,500 sleep-related infant deaths occur annually in the United States.[66] In 2020, there were about 1,389 deaths due to SIDS, about 1,062 deaths due to unknown causes, and about 905 deaths due to accidental suffocation and strangulation in bed.[67]

105.   Defendants knew or should have known of the risks of designing, manufacturing, marketing, distributing and selling the Products using the Safety Representations and Omissions when the Products suffered from the Defect, which does not provide a firm, flat, level sleeping surface.

106.   Nonetheless, Defendants failed to remedy the Defect or make any effort to redesign the Products to conform to their Safety Representations and Omissions.

107.   Moreover, Defendants' Recall Notice fails to address the risks presented by the defective Products and instead, continues to put infant children at risk of serious injury or death. Defendants failed to disclose the Defect to Plaintiff and Class Members at the time of purchase or thereafter, and despite admitting to the presence of the Defect in the Recall, still continue to represent that the Products can and should be used by its consumers.

### ***The Defect Preventing Babies from Safely Sleeping on Their Backs***

108.   Despite Defendants' Safety Representations and Omissions, the Firm/Flat Standard, and clear acknowledgment that "Back Is Best," Defendants designed, manufactured, distributed, marketed, and sold the Products with a uniform Defect that can and has caused babies to suffocate and die.

109.   The Products are Defective in that they are designed with a sleeping surface that is at a head-to-toe angle or incline. The Defect results in the Products'

---

[66] Moon, Rachel Y. et al, AAP TASK FORCE ON SUDDEN INFANT DEATH SYNDROME. *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment*, 138 Pediatrics 5 (2016).
[67] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

complete and utter failure to provide an appropriate level or flat sleeping surface, which would allow a baby to sleep safely on their back.

110.   Thus, the defective nature of the Product significantly increases the risk that the infant's head will slide into a dangerous position, tilt to constrict the windpipe, and/or cause the infant's face to become pressed against the padded fabric in the sleeper and block airflow, which the infant may be unable to correct. This increases the risk of death by asphyxiation and makes following requisite safe sleep precautions impossible.

111.   As noted above, *supra* ¶ 21-23, the Defendants clearly acknowledge that the Products contain the very Defect in the Recall:

> **Hazard:** The swing should **never be used for sleep** … If the product is used for sleep … the headrest and body support insert on the seat pad can **increase the risk of suffocation.**

112.   Additionally, in 2019, researchers concluded that inclined sleep products were hazardous, studied so-called infant seated products like bouncers, swings, and rockers to figure out whether they posed the same risks.[68]

113.   In 2023, the same group of researchers vehemently advised that many "seated products," such as the Products at issue in this proposed class action, had substantially similar designs to banned inclined sleepers, including the hazardous incline angle (emphasis added):[69]

---

[68] Mannen, et al., Seated Products Characterization and Testing 57 (2023), https://www.cpsc.gov/content/Report-Boise-State-Universitys-Seated-Products-Characterization-and-Testing (citing Mannen, et al., Biomechanical Analysis of Inclined Sleep Products (2019), https://www.cpsc.gov/s3fs-public/Dr-Mannen-Study-FINAL-Report-09-18-2019_Redacted.corrected_0.pdf?g.Jao0IN_zU.TjiX4FeSUM3SPc3Zt_25).

[69] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

> [T]he higher the incline angle, the more biomechanical
> impacts are subjected to the infants. . . . **Many of the seated
> products in this study feature substantially similar designs
> to the now-banned inclined sleep products**, while other
> seated products feature more upright designs. Much if not
> all of the research we conducted as part of our previous
> inclined sleeper study [in 2019] can be applied to many of
> the products in this current [2023] study on infant seated
> products.

114.    Just like the banned included sleepers, namely the Fisher-Price
Rock'n'Play Sleepers designed, manufactured, and sold by the same Defendants in
this case, the design of the Product have the ability to make infants fall into a deeper
sleep than normal sleep, which renders them less able to wake up if and when their
airflow becomes obstructed.

115.    Indeed, the CPSC adopted a rule banning inclined infant sleepers in
2021[70] and Congress enacted a law banning inclined infant sleepers in 2022[71] because

---

[70] *CPSC Approves Major New Federal Safety Standard for Infant Sleep Products*,
CPSC.gov, https://www.cpsc.gov/Newsroom/News-Releases/2021/CPSC-Approves-Major-New-Federal-Safety-Standard-for-Infant-Sleep-Products (accessed October 16, 2024).

[71] *Commissioner Trumka Warns That Fisher-Price's Snuga Recall Is Not Good Enough to Keep Babies Safe; Multiple Babies Dead*, CPSC.gov, https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/Commissioner-Trumka-Warns-That-Fisher-Price%E2%80%99s-Snuga-Recall-Is-Not-Good-Enough-to-Keep-Babies-Safe-Multiple-Babies-Dead (accessed October 16, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

the incline creates a hazard. According to researchers, the same hazard exists with seated products like swings and rockers when they are used for sleep:[72]

> Our in vivo human subjects testing showed significantly different body positions and muscle activity of infants in seated products compared to a firm flat surface. An infant may be able to achieve movements in seated product mechanical environments before they could do so on a firm flat surface, which could introduce additional hazards.

116.    Thus, the Defect renders every Product unreasonably dangerous and unsuitable for infant sleep at the point of purchase.

117.    Additionally, the Products do not and cannot comply with applicable safety standards, namely the AAP and the National Institutes for Health's recommendation that infants be put to sleep on their backs on sleeping surfaces that are firm and flat.[73]

118.    The Defect is latent such that no reasonable customer would know, or be able to discover through inspection, that the Product's support structure is Defective and presents a risk of danger to children at the time the Product is purchased.

---

[72] Mannen, et al., *Seated Products Characterization and Testing,* at page 201 (2023), https://www.cpsc.gov/content/Report-Boise-State-Universitys-Seated-Products-Characterization-and-Testing

[73] Moon, et al., *Evidence Base for 2022 Updated Recommendations for a Safe Infant Sleeping Environment to Reduce the Risk of Sleep-Related Infant Deaths*, AM. ACAD. OF PEDIATRICS, at 12 (July 2022), https://publications.aap.org/pediatrics/article/150/1/e2022057991/188305/Evidence-Base-for-2022-Updated-Recommendations-for?autologincheck=redirected (accessed May 6, 2024); *see also What Does A Safe Sleep Environment Look Like?* U.S. Dept. of Health and Human Services, National Institute of Health, (August 2022) NIH Pub. No. 22-HD-5759; *see also Tips for Keeping Infants Safe During Sleep From the American Academy of Pediatrics*, NEWS ROOM, AAP.ORG, (February 19, 2020); *What Does A Safe Sleep Environment Look Like?* U.S. Dept. of Health and Human Services, National Institutes of Health, (August 2022) NIH Pub. No. 22-HD-5759.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

However, Defendants knew or should have known of the Defect before it distributed the Products into the consumer marketplace.

119.   Safer alternative designs, including infant sleeping products with a flat and firm sleeping surface, were available to Defendants but not utilized. However, despite the availability and feasibility of these other reasonable alternatives, Defendants intentionally chose to design the Products with an inclined sleeping surface so that they could garner more market share at the expense of consumers.

120.   Plaintiff and the Class Members have a reasonable expectation that their Products will be safe for infants as advertised.

121.   Further, reasonable consumers expect the Products to be safe and suitable for infant sleep. However, due to the latent Defect, the Products fail to serve that purpose. Instead, they create an unreasonably dangerous inclined sleeping environment for the infant children of consumers who paid for and expected to receive a safe Product with an appropriately level or flat Sleeping Surface.

### *Defendants' Express and Implied Warranties*

122.   Defendants, Mattel and Fisher-Price, individually or together, expressly and impliedly warrant, via user manuals[74], advertisements, pamphlets, brochures, circulars, samples, and/or models, that the Products are fit for the ordinary purpose for which they are sold.

123.   However, as described herein, the Products contain a uniform Defect prior to and at the time of purchase, causing them to commonly and consistently fail in their primary purpose.

124.   Prior to purchasing the Products, Plaintiff and other Class Members did not know that the Products had the Defect that, contrary to Defendants' Safety Representations and Omissions, would place their infants in an unreasonably

---

[74]   Fisher-Price, Model No. DRG43 User Manual, https://m.media-amazon.com/images/I/A1Qm1C6kM1L.pdf (accessed October 22, 2024).

dangerous sleeping environment. Further, Consumers had no reason to know that the Safety Representations and Omissions was deceptive or misleading.

125.   Defendants clearly intended their warranties to apply directly to these consumers, the parents and caregivers who depend on the Defendants to provide reliable infant sleep products.

126.   Defendants' manifest intent that their warranties apply to Plaintiff and Class Members as third-party beneficiaries is evident from the statements in their product literature, which begins on the date of the consumers' purchases and excludes commercial, non-residential use.

### The Belated and Inadequate Recall Notice

127.   As set forth above, on October 10, 2024, **after at least five infants died in the Product**, the Defendants issued the Recall Notice for 2.1 million Products because the Product is unreasonably dangerous for its intended use as an infant sleep product.[75]

128.   The Recall Notice applies to all 21 models and variations of the Product in the United States, Australia, Canada, and Mexico.[76] All 21 models are substantially similar in their forward-facing representations to consumers and are uniform in that they contain the same Defect, as evidenced by their inclusion in the Recall Notice.

129.   Again, the Recall Notice announcement tilted, "Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths

---

[75] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, CPSC.gov, https://www.cpsc.gov/Recalls/2025/Fisher-Price-Recalls-More-than-2-Million-Snuga-Infant-Swings-Due-to-Suffocation-Hazard-After-5-Deaths-Reported (accessed October 22, 2024).

[76] *Id.*

Reported,"[77] clearly confirms the existence of the dangerous Defect and that the Product is completely unsafe for infant sleep:[78]

**Hazard:**

The swing should never be used for sleep and bedding materials should never be added to it. If the product is used for sleep or bedding material is added, the headrest and body support insert on the seat pad can increase the risk of suffocation.

130.   Despite the contradiction between the Defendants' Safety Representations and Omissions and this Recall, the Defendants, instead of recalling the entire product and advising consumers not to use it any longer, intentionally chose the route more profitable for their business and simply advised consumers to "immediately remove both the headrest (by cutting the tether) and the body support insert from the seat pad before continuing to use the swing for awake-time activities."[79] This is wholly inadequate and egregious, considering the circumstances.

131.   The Recall's effect of simply removing the two pieces of padding, the headrest and body support, from the Product completely fails to mitigate the safety risks presented by the Defect and does nothing to keep infant children safe as promised in Defendants' Safety Representations and Omissions.

132.   The result of the Recall Notice is a façade of action, which, in reality, allows and encourages consumers to continue to use the dangerous defective Product, which has and can now continue to lead to infant death.

---

[77] *Id.*
[78] *Id.*
[79] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

133.   As detailed above, CPSC Commissioner Trumka agrees and has publicly voiced his concern that the Recall Notice is inadequate, stating that it is "doomed to fail and will keep many babies in harm's way."[80]

134.   Because Defendants failed to issue an adequate recall, Commissioner Trumka has gone above and beyond and recommends that consumers "throw this product away; do not keep it in your homes because even after the so-called 'repair' this product will still be unsafe for infant sleep" because he is certain that "if these products remain in homes, many consumers will still use these products for sleep because they have received conflicting instructions over time." In support of this statement, the Commissioner cites the YouTube video referenced above where Defendants advertise the Products as intended for napping.[81]

135.   In addition to Commissioner Trumka, CPSC Chair Alexander Hoehn-Saric and Commissioner Mary T. Boyle also issued a statement the same day as the Recall, "Joint Statement of Chair Alexander Hoehn-Saric and Commissioner Mary T. Boyle Regarding the Recall of more than Two Million Snuga Swings" because they felt it did not go far enough to protect consumers.[82]

---

[80] *Commissioner Trumka Warns That Fisher-Price's Snuga Recall Is Not Good Enough to Keep Babies Safe; Multiple Babies Dead*, CPSC.gov, https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/Commissioner-Trumka-Warns-That-Fisher-Price%E2%80%99s-Snuga-Recall-Is-Not-Good-Enough-to-Keep-Babies-Safe-Multiple-Babies-Dead (Last accessed October 16, 2024).

[81] *Fisher-Price Cradle 'n Swing User Tips*, YouTube, (Nov. 6, 2015) https://youtu.be/WUecSoOOXnY?si=5V4W3QpU2EGEHfyM&t=62 (accessed October 21, 2024).

[82] *Joint Statement of Chair Alexander Hoehn-Saric and Commissioner Mary T. Boyle Regarding the Recall of more than Two Million Snuga Swings*, CPSC.gov, https://www.cpsc.gov/About-CPSC/Chairman/Alexander-Hoehn-Saric-Mary-T-Boyle/Statement/Joint-Statement-of-Chair-Alexander-Hoehn-Saric-and-Commissioner-Mary-T-Boyle-Regarding-the-Recall-of-more-than-Two-Million-Snuga-Swings (accessed October 22, 2024).

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

136.    In this statement, Chair Alexander Hoehn-Saric and Commissioner Mary T. Boyle have stated, "Congress and the Commission have made clear that inclined sleepers for infants are banned hazardous products. Simply put, a baby who falls asleep in an inclined product is at increased risk of suffocation and death."[83]

137.    Further, their joint statement highlights the Recall's inadequacies and like Commissioner Trumka, have made additional steps to try to protect consumers:[84]

> ***Unfortunately, banned and recalled infant products remain available for sale*** – both online and in stores – leaving parents and caregivers to face the daunting task of identifying what is actually safe. ***That is why, in conjunction with this recall, we have sent letters to key secondary market providers alerting them to the announcement, urging them to remove all recalled Snuga swings from their stores*** and platforms, and reminding them of the ban on inclined infant sleep products.

138.    Importantly, Chair Alexander Hoehn-Saric and Commissioner Mary T. Boyle also state that:

> The latest data released by CPSC in our 2024 report on Injuries and Deaths Associated with Nursery Products confirms that there is more work to be done to protect this most vulnerable group from hazardous products. We call on all those who profit from the sale of infant products to American families to step up to this important responsibility: keeping babies safe.

---

[83] *Id.*
[84] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

139.   As noted above, Consumer Reports has also participated in the public outcry regarding the inadequacies of the Recall Notice, claiming that "the recall doesn't go far enough to help families protect their children and ensure that consumers are made whole for spending money on a product that turned out to be hazardous."[85]

140.   William Wallace, Consumer Report's Associate Director of Safety Policy is quoted stating '"Once again, Fisher-Price is putting its bottom line first and safety last"' and '"There should be a full refund, and Fisher-Price should be urging people to throw away these swings. Retailers, online platforms, and secondhand marketplaces should all prohibit Snuga Infant Swings from being sold and take a range of steps to make sure they aren't listed."'[86]

141.   In addition to the Recall's failure to remove the entire Product from the marketplace and actually protect the infant children it put in danger in the first place, consumers will not be compensated for all costs they incurred in connection with the Product.

142.   Consumers paid approximately $160 or more for the Products, however, the Recall Notice only provides for reimbursement of a mere $25. This small amount is completely inadequate under the circumstances. It does not account for the total cost of the Product, nor does it make up for the taxes (without a receipt), shipping, handling and other charges paid when the original purchase of the product was made and further, it does not include costs associated with stopping use of the Product after

---

[85] *Over 2 Million Fisher-Price Snuga Baby Swings Recalled for Suffocation Risk*, ConsumerReports.com,    https://www.consumerreports.org/babies-kids/baby-product-recalls/fisher-price-snuga-baby-swings-recalled-for-suffocation-risk-a2341467743/?msockid=19f2d5f7732f63fe1135c60c725462ca    (Last    accessed October 22, 2024).
[86] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

the announcement of the Recall Notice such as replacing it with a different product that is safe for infant sleep.

143.  As Commissioner Trumka stated, "A $25 offer to strip parts off of a product people bought for $160 is not enough of an incentive to take that action."[87]

144.  Thus, the Defendants' Recall Notice is ineffective in providing consumers the proper monetary relief for their purchases of the dangerously defective and misrepresented Products and does nothing to stop infants from dying in the Products.

145.  Commissioner Trumka correctly claimed that Defendants' "actions do not show the commitment to ending product-related infant sleep deaths that [consumers] would expect to see from a company that claims to place safety as its highest priority."[88]

146.  He further clarified that based on Defendants' past failures with recalls for other products such as the Rock-n-Play, Defendants should know better. He stated, "Instead of learning from the failures of the past, Fisher-Price appears indifferent to repeating them. Fisher-Price should know better than to skimp on another recall."

147.  Moreover, it is well known that product recalls generally have a low level of participation when consumers are asked to deconstruct and physically destroy parts of the Products, but to continue using them in this destructed form.

---

[87] *Commissioner Trumka Warns That Fisher-Price's Snuga Recall Is Not Good Enough to Keep Babies Safe; Multiple Babies Dead*, CPSC.gov, https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/Commissioner-Trumka-Warns-That-Fisher-Price%E2%80%99s-Snuga-Recall-Is-Not-Good-Enough-to-Keep-Babies-Safe-Multiple-Babies-Dead (Last accessed October 16, 2024).

[88] *Id.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

## **DEFENDANTS' ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE DEFECT**

148.   Defendants knew or should have known when they sold the Products to the public that they suffered from the Defect, and that the Defect caused them to function improperly during their expected useful life, created an unsafe and dangerous sleeping environment for infants, and increased the potential for serious harm and/or death to the infant children.

149.   Defendants' knowledge of the Defect is established through their Recall, which states that babies have been dying in the Products since at least 2012.[89]

150.   Despite its knowledge, upon information and belief, Defendants did not remedy or eliminate the Defect in the Products or remove them from the stream of commerce. Instead, Defendants continued to unlawfully advertise the Products as safe and to sell the unreasonably dangerous Products to consumers.

151.   The Recall, for the reasons stated above, does not absolve Defendants of liability, especially given their position is a worldwide leader in the baby products' market.

152.   In conjunction with Defendants' vast experience with infant sleep products, these facts and reports of infant death illustrate that Defendants knew or should have known of the Defect and the resulting incapability of the Products to conform to their Safety Representations and Omissions.

153.   Defendants must disclose the Defect and to not conceal the Defect from Plaintiff and Class Members. Defendants' failure to disclose, or active concealment

---

[89] *Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported*, CPSC.gov, https://www.cpsc.gov/Recalls/2025/Fisher-Price-Recalls-More-than-2-Million-Snuga-Infant-Swings-Due-to-Suffocation-Hazard-After-5-Deaths-Reported (accessed October 22, 2024).

of, the Defect places Plaintiff and Class Members' infants at risk of serious injury and/or death.

154.    Defendants, even in light of the Recall, are currently still allowing the sale of the defective Product.

155.    Had Plaintiff, Class Members, and the consuming public known that the Product was defective, unsuitable for safe infant sleep, and risks their infant children's lives, they would not have purchased it.

156.    Defendants have wrongfully placed on Plaintiff and Class Members the burden, expense, and difficulty involved in discovering the Defect and determining that the Products are unsafe and paying for the cost of damages caused by the Defect.

## <u>INJURY TO THE PUBLIC-AT-LARGE AND THE POTENTIAL FOR FUTURE HARM</u>

157.    Defendants' wrongful conduct harms the public-at-large.

158.    Namely, by misrepresenting the Product as safe or suitable for infant sleep and by failing to disclose that the Product contains a uniform Defect and exposes infants to the risk of serious injury and death, the harm extends to all Class Members and consumers who may purchase the Product.

159.    In addition, because Defendants continue to encourage consumers to use the Product as described herein, Defendants' actions pose an ongoing risk to the public.

160.    As such, a public injunction is necessary to enjoin Defendants' continued harm of consumers and the public-at-large.

161.    Similarly, should Defendants not be enjoined from their unlawful and deceptive conduct, Plaintiff and Class Members face the potential for irreparable future harm, including purchasing the Product which is not safe or suitable for infant sleep and instead contains a uniform Defect and exposes infants to the risk of serious injury and death.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

**A.    Continuing Act Tolling**

162.    Defendants have continuously marketed and sold the dangerous Product to unsuspecting parents and caregivers of infants. They continuously represented that the Product is safe and suitable for infant sleep.

163.    By continuously repeating these false representations and failing to disclose that the Product is not safe or suitable for infant sleep, contains a uniform Defect, and exposes infants to risk of serious injury and death, Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Defendants might seek to apply.

164.    As the creator and manufacturer of the Product, Defendants have had actual knowledge since at least 2010, that the Product is defectively designed and exposes infants to great risk of serious injury and death.

165.    Defendants' knowledge of the Defect is evidenced by, amongst other things: the Recall Notice and reports of infant death in the Product.

166.    Thus, at all relevant times, Defendants indisputably possessed continuous knowledge of the material dangers posed by the Product, and yet Defendants knowingly continue to allow the sale of the Product. Plaintiff's and other Class Members' claims are not time barred.

167.    Moreover, even after the Recall, there is no evidence that news of the Recall Notice reached all owners of the Products.

168.    Plaintiff and other Class members could not have reasonably discovered and could not have known of facts that would have caused a reasonable person to suspect, that Defendants knowingly failed to disclose material information within their knowledge about a dangerous defect to consumers in the U.S. and elsewhere. Therefore, no potentially relevant statute of limitations should apply.

**B.    Fraudulent Concealment Tolling**

169.   Throughout the time period relevant to this action, Defendants concealed from and failed to disclose to Plaintiff and the other Class Members vital information about the Defect described herein.

170.   Defendants kept Plaintiff and the other Class Members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiff nor the other Class Members could have discovered the Defect, even upon reasonable exercise of due diligence.

171.   Further, Defendants create consumer confusion in their deficient Recall, encouraging consumers to continue to use the dangerous Product.

172.   Defendants had a duty to disclose to Plaintiff and the Class Members the true quality and nature of the Product, that the Product has a uniform dangerous Defect, and that it poses safety concerns and is in fact dangerous.

173.   This duty arose, among other things, from Defendants' explicit representations that the Product was safe and suitable for infant sleep.

174.   Throughout the Class Period, at all relevant times, Defendants have known that the Product, which they designed, manufactured, selected materials for and sold, contained the Defect resulting in premature failure in its essential purpose, and serious safety risks to infants.

175.   Defendants' actual knowledge of the serious safety concerns created by the use of the Product is evidenced by, among other things, Defendants' Safety Representations and Omissions and the reports of five infant deaths in the Product since 2012.

176.   Despite Defendants' knowledge of the Defect and serious safety issues posed by the Product when used as intended, Defendants failed to disclose and concealed this material information from Plaintiff and other Class Members, even though, at any point in time, they could have disclosed the Defect through an earlier recall, individual correspondence, media release, or by other means.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

177.   Instead, Defendants continued to market the Product as suitable for its intended purpose as a safe environment for soothing infants to sleep.

178.   The purpose of Defendants' concealment of the dangers was to continue to profit from the sale of their popular Product and to prevent Plaintiff and other Class Members from seeking redress.

179.   Plaintiff and the other Class Members justifiably relied on Defendants to disclose the true nature of the Product they purchased and/or owned because that Defect was not discoverable by Plaintiff and the other Class Members through reasonable efforts.

180.   Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which is ongoing. To this day, Defendants continue to insist the Product is safe when the body support insert is removed.

**C.   Discovery Rule Tolling**

181.   Plaintiff and other Class Members could not have discovered through the exercise of reasonable diligence that their Product was defective within the time-period of any applicable statutes of limitation.

182.   Among other things, neither Plaintiff nor the other Class Members knew or could have known that the Product contains the Defect.

183.   There is no evidence that Plaintiff was aware of the Product's dangerous Defect and safety risks. Defendants have concealed and misrepresented the dangerous Defect in the Product and the risks that were posed by that Defect.

184.   Plaintiff and other Class Members could not have reasonably discovered and could not have known of facts that would have caused a reasonable person to suspect, that Defendants knowingly failed to disclose material information within their knowledge about a dangerous Defect to consumers in the U.S. and elsewhere.

185.   As such, no potentially relevant statute of limitations should be applied.

**D.    Estoppel**

186.    Defendants were under a continuous duty to disclose to Plaintiff and other Class Members the fact they knew about the dangerously defective nature of the Product.

187.    Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Product from Plaintiff and Class Members.

188.    Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## UNCONSCIONABILITY AND FAILURE OF ESSENTIAL PURPOSE OF THE EXPRESS AND IMPLIED WARRANTIES

189.    The express and implied warranties relating to the Product are collectively and individually are the result of surprise and oppression and are so one-sided and overly harsh such that they are both procedurally and substantively unconscionable.

190.    In addition, the Warranty fails of its essential purpose in that (1) the Defect exists at the time the Product leaves the manufacturing facility and (2) Defendants fail to disclose its knowledge of the Defect when contacted by customers about the Product's failures.

## FED. R. CIV. P. 9(b) ALLEGATIONS
### (Affirmative and By Omission)

191.    Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Although Defendants are in the best position to know what content they placed on its website and in marketing materials during the relevant timeframe, to the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

192.  **WHO:** Defendants made material misrepresentations and/or omissions of fact, through their Safety Representations and Omissions, on their website representations, product packaging, warranties, owner's manuals, labeling and marketing, through employees receiving warranty claims, and through authorized retailers of the Product, which include statements such that the Product is not defective and is safe and suitable for infant sleep.

193.  **WHAT:** Defendants' conduct here was, and continues to be, fraudulent because they omitted and concealed that the Product is defective, unsafe, and unsuitable for infant sleep in that it contains a uniform Defect. Defendants' employees and representatives made affirmative misrepresentations as a part of Defendants' Safety Representations and Omissions, to Plaintiff and Class Members at the time of purchase regarding the same qualities. Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die. Further, Defendants' conduct has the effect of deceiving Plaintiff and Class Members into believing that the Product is not defective, and instead, is safe and suitable for infant sleep. Defendants knew or should have known this safety information is material to the reasonable consumer, including Plaintiff and Class Members, and impacts the purchasing decision, and yet they omit a necessary warning that the Product is defective and is unsafe and unsuitable for infant sleep.

194.  **WHEN:** Defendants made the material misrepresentations and/or omissions, as a part of their Safety Representations and Omissions, detailed herein at the time Plaintiff and Class Members performed research on the Product to gather information that would aid them in selecting the best product to purchase and at the time Plaintiff and Class Members purchased the Product.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

195.  **WHERE:** Defendants' Safety Representations and Omissions including their material misrepresentations and/or omissions were made on their website, through marketing materials, in warranties, in user manuals, on the labeling of the packaging, through employees, and through authorized retailers.

196.  **HOW:** Defendants made written misrepresentations and/or failed to disclose material facts regarding the true safety risks and serious dangers created by normal use of the Product in written form, electronic form, or conventional hardcopy form, as well as verbally through statements made by their employees and authorized retailers as a part of their Safety Representations and Omissions.

197.  **WHY:** Defendants engaged their Safety Representations and Omissions including their material misrepresentations and/or omissions detailed herein (*e.g.*, knowing and concealing that knowledge of the Defect) for the express purpose of inducing Plaintiff, Class Members, and other reasonable consumers to purchase and/or pay for the Product. Defendants profited by selling the Product to many thousands of consumers, and consciously chose profits over safety by issuing a partial Recall Notice and a warning to save money while leaving the dangerous Product in the homes of millions.

198.  **INJURY:** Plaintiff and Class Members purchased the Product when they otherwise would not have absent Defendants' Safety Representations and Omissions including its misrepresentations and/or omissions, and, alternatively, paid more for the Product than they would have absent Defendants' misrepresentations and/or omissions.

## CLASS ACTION ALLEGATIONS

199.  Plaintiff brings this action individually and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of herself and the members of the following proposed nationwide class ("**Nationwide Class**"):

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

**During the fullest period allowed by law, all persons who purchased the Products in the United States for personal use and not resale.**

200.    Plaintiff Shahbaz brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following proposed California class ("**California Subclass**"):

**During the fullest period allowed by law, all persons who purchased the Products in the State of California for personal use and not for resale.**

201.    Specifically excluded from these definitions are: (1) Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiff reserves the right to amend the Class definition as necessary.

202.    Plaintiff seeks only damages and equitable relief on behalf of herself and the putative Classes. Plaintiff disclaims any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiff and/or putative Class Members.

203.    Plaintiff reserves the right to modify the class definitions, if necessary, to include additional products made by Defendants with the same Defect and/or other products manufactured by Defendants with the common Defect but bearing different brand names.

204.    **Numerosity:** The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of at least thousands of people throughout the United States and the state(s) of California as 2.1 million Products were sold. The number of

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable from information and records in the possession of Defendants and its authorized distributor and retailers.

205.  **Typicality:** The claims of the representative Plaintiff are typical in that Plaintiff, like all Class Members, purchased a Product that was manufactured, marketed, advertised, distributed, and sold by Defendants. Plaintiff, like all Class Members, was damaged by Defendants' uniform misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for the Product that was manufactured with the Defect, which makes it unusable, inherently dangerous, and not fit for its intended use, and which is subject to an inadequate recall. Furthermore, the factual basis of Defendants' misconduct is common to all Class Members because it engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members. Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Classes she seeks to represent.

206.  **Commonality:** Common questions of law and fact exist as to all Members of the Class. These questions predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Class. Such common legal or factual questions include, *inter alia*:

a.  Whether the Products are defective;

b.  Whether the Products are defectively designed and/or manufactured;

c.  Whether Defendants knew or should have known about the Defect in their Products prior to distributing and selling them to Plaintiff and Class Members;

d.  Whether Defendants knew or should have known about the Defect in its Products after distributing and selling them to Plaintiff and Class

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

Members;

e.    Whether Defendants concealed from and/or failed to disclose to Plaintiff and Class Members that the Products contained a uniform Defect;

f.    Whether Defendants failed to adequately warn Plaintiff and Class Members that the Products contained the Defect, were not safe or suitable for infant sleep, and could and have caused infants to be placed in dangerous sleep positions, suffocate, and die;

g.    Whether Defendants engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the Products containing the Defect;

h.    Whether Defendants' claims about the Products being safe and suitable for infant sleep are true;

i.    Whether Defendants' claims about the Products being safe and suitable for infant sleep including back sleep are reasonably likely to deceive;

j.    Whether Defendants' claims about the Products being safe and suitable for infant sleep including back sleep are material to reasonable consumers;

k.    Whether Defendants' practices in marketing, advertising, and packaging the Products tend to mislead reasonable consumers into believing that the Products are safe and suitable for infant sleep;

l.    Whether Defendants omitted or failed to disclose material information to Plaintiff and Class Members regarding the Products;

m.    Whether Defendants concealed from and/or failed to disclose to Plaintiff and Class Members that the Products are not safe and not suitable for infant sleep;

n.    Whether Defendants engaged in false or misleading advertising by

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

selling, packaging, and/or marketing the Products;

o.   Whether Defendants have violated consumer protection statutes;

p.   Whether Defendants have been unjustly enriched;

q.   Whether Defendants breached the implied warranty of merchantability;

r.   Whether Defendants breached express warranties relating to the Products;

s.   Whether Plaintiff and Class Members either paid a premium for the Products that they would not have paid but for their false representations or would not have purchased them at all;

t.   Whether Plaintiff and the members of the Class have been injured by Defendants' misconduct, and the proper measure of their losses as a result of those injuries;

u.   Whether Plaintiff and the members of the Class are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount and nature of such damages; and

v.   Whether Plaintiff and the members of the Class are entitled to injunctive, declaratory, or other equitable relief including enjoining Defendants from selling and marketing the Products containing the Defect and/or implementing a corrective advertising campaign to alert caregivers to the safety concerns and dangers of the Products and educating them about the safety standards for infant sleep.

207.   Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and other Class Members. Similar or identical statutory violations, common law wrongs, business practices, and injuries are involved. Individual questions, if there are any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

208.  **Adequate Representation:** Plaintiff will fairly and adequately protect the interests of Class Members. She has no interests antagonistic to those of Class Members. Plaintiff retained attorneys experienced in the prosecution of class actions, including consumer products, product defects, misrepresentation, mislabeling, and class actions, and Plaintiff intends to prosecute this action vigorously.

209.  **Injunctive/Declaratory Relief:** The elements of Rule 23(b)(2) are met. Defendants will continue to commit the unlawful practices alleged herein, and Plaintiff and Class Members will continue to be deceived by Defendants' misrepresentations and omissions and unknowingly be exposed to the risk of serious and life-threatening harm associated with the Product. Defendants have acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief, public injunctive relief, and corresponding declaratory relief are appropriate respecting the Class as a whole. Injunctive relief, and specifically public injunctive relief, is necessary in this action.

210.  Plaintiff further seeks injunctive and declaratory relief requiring Defendants to cease their unfair, deceptive, and unlawful conduct, including a complete recall of the entire product and full reimbursement for the full purchase price.

211.  Plaintiff also seeks a declaration that the Product suffers from the Defect and that all warranties cover the Defect, which existed at the time of sale of the Product to consumers, which was known to Defendants and unknown to consumers.

212.  Plaintiff and Class Members have been harmed and will experience irreparable future harm should Defendants' conduct not be enjoined because they will continue to use to Product, which still contains the Defect even if the headrest and body support are removed as instructed by the Recall.

213.  **Predominance and Superiority:** Plaintiff and Class Members have all suffered and will continue to suffer risk of harm and damages as a result of

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high given the average price point of the Product and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

214.   The claims presented in this case predominate over any questions of law or fact affecting individual Class Members

215.   Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

216.   Defendants' failure to implement an adequate recall for the Products arises out of a common omission or failure to act, which has a uniform effect on Plaintiff and all Class Members. Plaintiff seeks preliminary and permanent injunctive relief and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to require Defendants to discontinue their unlawful conduct.

217.   Defendants implemented uniform procedures relating to the Recall, which resulted in uniform damage to Plaintiff and Class Members. As a result, Defendants have acted or refused to act on grounds generally applicable to each Class Member, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

218.   Because Plaintiff seeks injunctive and corresponding declaratory and equitable relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### *Violations of The California Legal Remedies Act ("CLRA"),*

### Cal. Civil Code §§ 1750, *et seq.*

### (Plaintiff Individually and on Behalf of the Nationwide Class and, in the alternative California Subclass)

219.   Plaintiff, individually and on behalf of the California Class, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

220.   The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*

221.   The CLRA applies to all claims of all California Class Members because the conduct which constitutes violations of the CLRA by Defendants occurred within the State of California.

222.   The Product is a "good" within the meaning of the statute under Cal. Civil Code § 1761(a).

223.   Plaintiff and California Class Members are "consumers" as defined by Civil Code § 1761(d).

224.   Plaintiff and the California Class Members' purchases of the Product are "transactions" as defined by Civil Code § 1761(e).

225.   As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful:

     a.   "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

     b.   "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

     c.   "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9);

     d.   "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law." Civil Code § 1770(a)(14); and

     e.   "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

226.   Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Civil Code § 1770(a)(5), (a)(7), (a)(9), (a)(14), and (a)(16) when they manufactured, supplied, distributed, and/or sold the Product which was advertised and/or warranted as safe and suitable for infant sleep, but otherwise concealed a known Defect rendering the Product unsafe and unsuitable for infant sleep.

227.   More specifically, Defendants misrepresented, *inter alia*, that the Product was safe and suitable for infant sleep, when the defective design of the Product renders it unsafe and unsuitable for infant sleep.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

228.   Defendants knowingly and willfully represented that the Product is safe and suitable for infant sleep, despite their knowledge that the Product contained the Defect, as described in detail herein.

229.   Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die.

230.   Defendants' misrepresentations and omissions were material to Plaintiff's and California Class Members' decisions to purchase the Products.

231.   As a result of Defendants' misrepresentations and omissions, Plaintiff and California Class Members purchased and paid for products that did not conform to Defendants' promises that the Product would provide a safe infant sleep space, and they were deprived of the benefit of their bargain and spent money on products they would not have purchased had they known the true facts regarding the Defect.

232.   Defendants' business practices are misleading and/or likely to mislead consumers and should be enjoined.

233.   In accordance with Civil Code § 1780(a), Plaintiff and the other California Class Members seek injunctive and equitable relief for Defendants' violations of the CLRA, including an injunction to enjoin Defendants from continuing their deceptive sales practices.

234.   Pursuant to Cal. Civ. Code § 1782, Plaintiff notified Defendants in writing by certified mail sent on October 23, 2024, of its violations of § 1770 described above and demanded that they correct the problems associated with the actions detailed above and give notice to all affected consumer of Defendants' intent to do so.

235.   If Defendants do not agree to rectify the problems identified and give notice to all affected consumers within 30 days of the date of written notice, Plaintiff

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

will amend this Complaint to seek actual, punitive, and statutory damages, as appropriate.

236.   Attached hereto is a declaration establishing that venue in this District is proper pursuant to Cal. Civ. Code § 1780(d).

237.   In accordance with Civil Code § 1780(a), Plaintiff and the other California Class Members seek injunctive and equitable relief for Defendants' violations of the CLRA, including an injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

## SECOND CLAIM FOR RELIEF

### *Violations of The California Unfair Competition Law ("UCL"),*

**Cal. Bus. & Prof. Code §§ 17200, Et Seq.**

**(Plaintiff Individually and on Behalf of the Nationwide Class and, in the alternative, California Subclass)**

238.   Plaintiff, individually and on behalf of the California Class, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

239.   Defendants violated the UCL, pursuant to Cal. Bus. & Prof. Code § 17200, by engaging in "unfair competition" which is defined as "any unlawful, unfair, or fraudulent business practices [including] unfair, deceptive, untrue or misleading advertising."

240.   Defendants' actions, as alleged herein, constitute fraudulent, unfair, deceptive, and unlawful business practices committed in violation of the UCL because it violated the CLRA, as described above.

241.   All of the conduct and representations alleged herein occurred in the course of Defendants' business and were part of a pattern or generalized course of illegal conduct.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

242.   Defendants' conduct was fraudulent because Defendants failed to disclose the Defect associated with the Product.  Specifically, Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die.

243.   Defendants' conduct was unfair because it was specifically designed to and did induce Plaintiff and California Class Members to purchase the Product.

244.   Defendants' conduct was deceptive because it was specifically designed to and did induce Plaintiff and California Class Members to purchase the Product despite knowing that it contained the dangerous Defect.

245.   Plaintiff and California Class Members reasonably and justifiably relied on Defendants' conduct alleged herein. But for such conduct, Plaintiff and California Class Members would not have purchased the Product or would have paid less for it.

246.   As a result of Defendants' conduct, Plaintiff and California Class Members have suffered injury-in-fact, lost money, and potential damage to property, in that they have incurred actual costs to repair and/or replace the Product upon manifestation of the Defect.

247.   Plaintiff and California Class Members seek to recover from Defendants restitution of earnings, profits, compensation, and benefits obtained as a result of the practices that are illegal under the aforementioned statute.

**THIRD CLAIM FOR RELIEF**

***Violations of The California False Advertisement Law ("FAL")***

**CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***

**(Plaintiff Individually and on Behalf of Nationwide Class and, in the alternative California Subclass)**

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

248.   Plaintiff, individually and on behalf of the California Class, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

249.   The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of the FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq*.

250.   Pursuant to the FAL, "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

251.   Defendants marketed, labeled, and represented the Product as merchantable and fit for the ordinary purposes for which they were used and sold and were not otherwise injurious to consumers.

252.   More specifically, Defendants misrepresented through their Safety Representations and Omissions, *inter alia*, that the Product is safe and suitable for infant sleep.

253.   To the contrary, the Product contained the dangerous Defect at the time of purchase and no reasonable consumer would believe that, in light of the dangerous Defect, that the Product was merchantable or fit for the ordinary purpose for which it was used and sold or was not otherwise injurious to consumers, where Plaintiff and Class Members could not immediately identify the Defect.

254.   Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die.

255.   At the time of their misrepresentations, Defendants were either aware of the Defect or were aware that they lacked the information and/or knowledge required

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

to make such a representation truthfully. Defendants concealed, omitted, and failed to disclose this information to Plaintiff and California Class Members.

256. Defendants' descriptions of the Product were false, misleading, and likely to deceive Plaintiff and other reasonable consumers.

257. Defendants' conduct therefore constitutes deceptive or misleading advertising.

258. Plaintiff has standing to pursue claims under the FAL as she reviewed and relied on Defendant's packaging, advertising, representations, and marketing materials regarding the Product when selecting and purchasing the Product.

259. In reliance on the statements made in Defendants' advertising and marketing materials and Defendants' omissions and concealment of material facts regarding the quality and use of the Product, Plaintiff and California Class Members purchased the Product.

260. Had Defendants disclosed the true nature of the Product (that it contained the dangerous Defect), Plaintiff and California Class Members would not have purchased the Product or would have paid substantially less for them.

261. As a direct and proximate result of Defendants' actions, as set forth herein, Defendants have ill-gotten gains and/or profits, including but not limited to money from Plaintiff and California Class Members who paid for the Product, which contained the Defect.

262. Plaintiff and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendants and by means of its deceptive or misleading representations, including monies already obtained from Plaintiff and California Class Members as provided for by the FAL.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

**FOURTH CLAIM FOR RELIEF**

***Breach of Implied Warranties***

**(Plaintiff Individually and on Behalf of the Nationwide Class and, in the alternative, California Subclass)**

263.    Plaintiff, individually and on behalf of the California Class, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

264.    Defendants are and were at all relevant times a merchant involved in the manufacturing, distributing, warranting, and/or selling of the Products.

265.    The Products were and are, at all relevant times, a "good" within the relevant laws. Defendants knew or had reason to know of the specific use for which the Products, as goods, were purchased.

266.    Defendants entered into agreements with retailers, suppliers, and/or contractors to sell its Product to be used by Plaintiff and Class Members.

267.    Defendants provided Plaintiff and Class Members with implied warranties that the Product was merchantable and fit for the ordinary purposes for which the Product was used and sold and was not otherwise injurious to consumers, that the Product would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by Defendants in its Safety Representations and Omissions. This implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendants, and Plaintiff and Class Members.

268.    However, at the time of delivery, Defendants breached the implied warranty of merchantability because the Product is not fit for its ordinary purpose of providing a reasonably safe infant product that is suitable for infant sleep because, *inter alia*, the Product contains the Defect rendering the Product unsafe and

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

unsuitable for infant sleep, and unreasonably dangerous. Therefore, the Product is not fit for its particular purpose.

269.   As alleged herein, Plaintiff was forced to completely discontinue her use of the Product shortly after her purchase when the Defect was discovered due to the ongoing safety risk of placing her infant in an unsafe sleeping environment.

270.   The aforementioned problems associated with Products constitute safety risks, such that the Product is not safe nor suitable for infant sleep, and therefore, there is a breach of the implied warranty of merchantability.

271.   Moreover, due to the inadequate and unfair nature of the Recall, it is not required and would be futile for Plaintiff to provide Defendants further opportunity to cure their breach.

272.   Plaintiff and Class Members have had sufficient direct dealings with either Defendants or one of their authorized retailers, representatives, and agents to establish privity of contract between Defendants, on the one hand, and Plaintiff and each Class Member, on the other hand.

273.   Privity is not required because Plaintiff and each of the Class Members are the intended beneficiaries of Defendants' warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Product and have no rights under the warranties provided by Defendants. Defendants' warranties were designed for and intended to benefit the consumer only and Plaintiff and Class Members were the intended beneficiaries of the Product.

274.   More specifically, Defendants' manifest intent was that their warranties apply to Plaintiff and Class Members as third-party beneficiaries. Likewise, it was reasonably foreseeable that Plaintiff and Class Members would be the intended beneficiary of the Product and warranties.

275.   Defendants impliedly warranted that the Product is safe, suitable for infant sleep, of merchantable quality, and fit for its intended purpose. These implied

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

warranties included, among other things: (i) a warranty that the Product manufactured, supplied, distributed, and/or sold by Defendants was safe and suitable for infant sleep; (ii) a warranty that the Product would be fit for its intended use while the Product is being used; and (iii) a warranty that the Product would conform to all of the promises and affirmations of fact on the Product's label and online advertising.

276.    Contrary to the applicable implied warranties, the Product, at the time of sale and thereafter, was and is not fit for its ordinary and intended purpose of providing Plaintiff and Class Members with a reasonably reliable and safe infant product. Instead, the Product contains a defective design and/or manufacture, as alleged herein. As a result of the Defect, the Product fails to conform with the promises or affirmations of fact on its label and online advertising.

277.    Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die.

278.    Defendants breached the implied warranties because the Product was and is sold with the Defect, which prevents the Product from even the most basic degree of fitness for ordinary use as a reliable and safe sleeping product.

279.    Defendants' attempt to limit or disclaim any implied warranties is unconscionable and therefore unenforceable.

280.    Plaintiff's complete inability to use the Product for its intended purpose, resulting from the fact that the Product did not meet the most basic degree of fitness for providing a safe sleep space for infants, renders any attempts to limit or disclaim damages substantively unconscionable.

281.    The limitations contained in the warranty are unconscionable and inadequate to protect Plaintiff and Class Members. Plaintiff and Class Members had no meaningful choice in determining the terms of which unreasonably favored Defendants, who had superior and exclusive knowledge of the Defect, which existed

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

at the time of sale of the Product. A gross disparity in bargaining power existed between Defendants, and Plaintiff and the Class Members, and Defendants knew or should have known that the Product was defective at the time of sale and would fail before its useful life.

282.   Plaintiff's inability to view Defendants' purported disclaimers prior to her purchase, along with her inability to negotiate its terms or make a different choice at the time of purchase, renders any disclaimers procedurally unconscionable. The unavailability of additional warranty coverage from Defendants further demonstrates the disclaimer of implied warranties is procedurally unconscionable.

283.   Contrary to the applicable implied warranties, the Product, at the time of sale and thereafter, was not fit for its ordinary and intended purpose of providing a safe sleeping space for infants. Instead, the Product suffered, and continues to suffer, from the Defect as alleged herein.

284.   Defendants' failure to adequately repair or replace the dangerous Product caused the warranty to fail in its essential purpose.

285.   As a direct and proximate result of the foregoing, Plaintiff and the Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## FIFTH CLAIM FOR RELIEF

### (In the Alternative)

### *Unjust Enrichment*

### (Plaintiff Individually and on Behalf of the Nationwide Class and, in the alternative California Subclass)

286.   Plaintiff, individually and on behalf of the Nationwide Class and/or California Subclass ("Class" for purposes of this Claim), brings this cause of action

and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

287. Plaintiff brings this claim under California law.

288. Defendants' unfair and unlawful conduct includes, among other things, designing, manufacturing, and selling the Products with the dangerous Defect as well as making false and misleading representations about the Products through its Safety Representations and Omissions such as representing that is safe and suitable for infants sleeping on their backs. Defendants falsely represented the Product as being safe and suitable for infant sleep in its packaging, labeling, marketing, advertising, and promotions. Contrary to these representations, the Product poses an unreasonable risk of serious injury and death to infants.

289. Defendants have continued to tout the safety of the Product even though the Product can and has caused numerous infants to roll from their backs to dangerous sleeping positions due to the Defect.

290. Defendants omitted, concealed, and failed to disclose to consumers that the Product poses serious safety risks to infants, including that the Product is inherently defective; unreasonably dangerous; not fit to be used for its intended purpose; and contains a uniform Defect that renders the Product unsafe and unsuitable for infant sleep. Rather than disclose this information, Defendants marketed the Product as safe for its intended purpose.

291. Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die.

292. Defendants' acts and business practices offend the established public policy of California, as there is no societal benefit from false advertising, only harm. While Plaintiff and Class Members were harmed at the time of purchase, Defendants

were unjustly enriched by their misrepresentations, false statements and/or material omissions.

293.   Plaintiff and Members of the Class were harmed when they purchased Defendants' Product as a result of Defendants' misrepresentations, false statements and/or material omissions, as described in this Complaint. The Plaintiff and each Class Member purchased Defendants' Product. Plaintiff and Members of the Classes have suffered injury in fact and lost money as a result of paying the price they paid for the Product due to Defendants' unlawful, unfair, and fraudulent business practices.

294.   Defendants' conduct allows them to knowingly realize substantial revenues from selling the Product at the expense of, and to the detriment of, Plaintiff and Class Members, and to Defendants' benefit and enrichment. Defendants' retention of these benefits violates fundamental principles of justice, equity, and good conscience.

295.   Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendants for the Product, which was not as Defendants represented it to be.

296.   Under common law principles of unjust enrichment and quasi-contract, it is inequitable for Defendants to retain the benefits conferred by Plaintiff's and Class Members' overpayments.

Plaintiff and Members of the Classes seek disgorgement of all profits resulting from such overpayment.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

# SIXTH CLAIM FOR RELIEF

## *Fraud*

### (Plaintiff Individually and on Behalf of the Nationwide Class and, in the alternative California Subclass)

297.   Plaintiff, individually and on behalf of Nationwide Class and, in the alternative, the California Class, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

298.   Defendants knew or should have known that the Product contains the dangerous Defect rendering the Product unsafe and unsuitable for infant sleep.

299.   Defendants provided Plaintiff and Nationwide Class Members with false or misleading material information and failed to disclose material facts about the true nature of the Product, including but not limited to the fact it contains the dangerous Defect rendering the Product unsafe and unsuitable for infant sleep contrary to Defendants' misrepresentations.

300.   Defendants promised consumers that the Product was fit for its intended purpose and that it was free of defects and that it was safe and suitable for infant sleep through its Safety Representations and Omissions.

301.   Defendants had exclusive knowledge of the Product's Defect at the time of sale and at all other relevant times. Neither Plaintiff nor Nationwide Class Members, in the exercise of reasonable diligence, could have independently discovered the true nature of the Product prior to purchase.

302.   Defendants had the capacity to, and did, deceive Plaintiff and Nationwide Class Members into believing they were purchasing a product that was safe and suitable for infant sleep.

303.   Defendants undertook active and ongoing steps to conceal the presence of the Defect in the Product. Plaintiff is not aware of anything in Defendants'

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

advertising, publicity, or marketing materials that disclosed the truth about the Product, despite Defendants' awareness of the problem.

304.    The facts concealed and/or not disclosed by Defendants to Plaintiff and Nationwide Class Members are material facts in that a reasonable person would have considered them fundamental in deciding whether to purchase (or pay the same price for) the Product.

305.    Defendants intentionally concealed and/or failed to disclose material facts for the purpose of inducing Plaintiff and Nationwide Class Members to act thereon.

306.    Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die.

307.    Plaintiff and Nationwide Class Members justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the Product.

308.    The misrepresentations and omissions made by Defendants, upon which Plaintiff and Nationwide Class Members reasonably and justifiability relied, were intended to induce and actually induced Plaintiff and Nationwide Class Members to purchase the Product.

309.    Plaintiff and Nationwide Class Members suffered a loss of money in an amount to be proven at trial as a result of Defendants' fraudulent concealment and nondisclosure because they would not have purchased the Product, or would not have purchased the Product for the price they did, if the true facts concerning the Product had been known.

310.    Plaintiff and Nationwide Class Members are entitled to all relief the Court proper as a result of Defendants' actions described herein.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

## SEVENTH CLAIM FOR RELIEF

### (In The Alternative)

### *Negligent Misrepresentation*

### (Plaintiff Individually and on Behalf of the Nationwide Class and, in the alternative California Class)

311.  Plaintiff, individually and on behalf of the California Class, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

312.  Pursuant to California law, a plaintiff must prove the following for a negligent misrepresentation claim: (1) a false statement of a material fact; (2) Defendant's knowledge that the statement was false; (3) Defendant's intent that the statement induces a plaintiff to act; (4) Plaintiff's reliance upon the truth of the statement; and (5) Plaintiff's damages resulting from reliance on the statement.

313.  As a seller of the Product and merchant, Defendants had a duty to give correct information to Plaintiff and Class Members regarding the truth and accuracy regarding the material facts concerning the serious safety risks posed by the Product including knowledge of the Defect. Defendants had sole possession and control of this information and had a duty to disclose it accurately to Plaintiff and Class Members.

314.  Defendants created a special relationship with Plaintiff and Class Members through their Safety Representations and Omissions and through their designing, manufacturing, marketing, and selling the Product as a product specifically suitable for infant back sleep.

315.  Defendants intended the sale of the Product to not only affect Plaintiff and Class Members, but Defendants actually considered the particular needs of caregiving consumers and designed, manufactured, and sold the Product for those consumers to meet their particular needs.

316.    Defendants held or appeared to hold unique or special expertise and knowledge of safe infant sleep and products for safe infant sleep. Defendants and Plaintiff as well as Class Members had a special relationship of trust and confidence, and Defendants persuaded Plaintiff and Class Members to purchase the Product based on its representations and reputation of having expertise and knowledge.

317.    Defendants made misrepresentations to Plaintiff and Class Members through its Safety Representations and Omissions, *inter alia*, that the Product is a product that is safe and suitable for infant sleep. Additionally, Defendants falsely represented to Plaintiff and Class Members that the Product could be used by infant sleep. These misrepresentations were made with the direct purpose of inducing Plaintiff and Class Members into purchasing the Product

318.    Because the Defect in the Product could not be detected until after it manifested, and because Defendants has denied and purposefully concealed the defective nature of the Product and the serious safety risks caused by the Defect, Plaintiff and the Class Members were not reasonably able to discover the Defect, despite their exercise of due diligence.

319.    Defendants knew, or otherwise should have known, that the Product contained the Defect and posed serious safety risks to infants, including Plaintiff and Class Members based upon: (1) Defendants' own internal testing, data, and surveys; (2) Defendants' Recall; and (3) the multiple reports of infant death in the Products.

320.    Despite Defendants' knowledge of material facts concerning the existence of the serious safety risks posed by the Product, Defendants actively concealed the serious safety risks from consumers by failing to disclose the serious safety risks to consumers.

321.    Defendants omitted, concealed, and failed to disclose to consumers that the Product poses serious safety risks to infants, including that the Product is inherently defective; unreasonably dangerous; not fit to be used for its intended

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

purpose; and/or is capable of causing serious injury and death to infants. Rather than disclose this information, Defendants marketed the Product as safe and suitable for its intended purpose, infant sleep.

322. Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die.

323. Defendants undertook active and ongoing steps to conceal the serious safety risks posed by the Product to infants. Plaintiff is unaware of anything in Defendants' advertising, labeling, marketing, or other communications to the consuming public that disclosed the truth about the serious safety risks posed by the Product, despite Defendants' awareness of such serious safety risks. In fact, Defendants continues to deny and conceal the existence of such safety risks associated with the Product.

324. The facts concealed and/or not disclosed by Defendants to consumers, including Plaintiff and other Class Members, were material, in part, because they concerned an essential aspect of the Product, including the intended use and safety. Such facts affect the conduct of purchasers, and a reasonable person would have considered those facts to be important in deciding whether to purchase the Product. Rather than disclose this information, Defendants marketed and labeled the Product as a safe infant sleeper.

325. Defendants intentionally concealed and/or failed to disclose such material facts for the purpose of inducing consumers, including Plaintiff and other Class Members, to purchase the Product.

326. Plaintiff and other Class Members, without knowledge of the true nature of the Product, justifiably acted or relied upon the concealed and/or nondisclosed material facts to their detriment, as evidence by their purchase of the Product.

327.  As a direct and proximate result of Defendants' concealment and/or nondisclosure of material facts, consumers, including Plaintiff and other Class Members have been damaged as alleged herein, and are entitled to recover damages. Plaintiff and other Class Members would not have purchased the Product on the same terms had they known that the Product posed serious safety risks to their infants.

328.  Plaintiff and Class Members are entitled to all relief the Court finds proper as a result of Defendants' conduct described herein.

## EIGHTH CLAIM FOR RELIEF

### *Negligence – Failure to Warn*

### *(Plaintiff Individually and on Behalf of the Nationwide Class and, in the alternative, California Subclass)*

329.  Plaintiff, individually and on behalf of the California Class, brings this cause of action and hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

330.  Defendants directly or indirectly, caused the Product to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff and the other Class Members.

331.  At all times relevant, Defendants had a duty to exercise reasonable care in the design, testing, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of the Product, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the Product.

332.  At all times relevant, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Product. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using the Product and appropriate,

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

complete, and accurate warnings concerning the potential safety risks regarding the use of the Product, and, in particular, its uniform Defect.

333.   At all times relevant, Defendants knew or, in the exercise of reasonable care, should have known of the safety hazards and dangers the Product and, specifically, the uniform Defect.

334.   Defendants knew, or otherwise should have known, that the Product posed serious safety risks to infants, including Plaintiff's and the other Class Members' infants, based upon: (1) their own internal testing, data, and surveys; (2) Defendants' Recall; and (3) the multiple reports of infant death in the Products.

335.   Accordingly, at all times relevant, Defendants knew or, in the exercise of reasonable care, should have known that use of the Product created a dangerous and unreasonable risk of injury and death to the infants using the Product, including Plaintiff's and the other Class Members' infants.

336.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of the Product were unaware of the safety risks and the magnitude of the safety risks associated with use of the defective Product.

337.   Defendants omitted, concealed, and failed to disclose to consumers that the Product poses serious safety risks to infants, including that the Product was inherently defective; unreasonably dangerous; not fit to be used for its intended purpose; contained a Defect; and created an unsafe sleeping environment for infants. Defendants failed to adequately warn Plaintiff and Class Members that the Product contained the Defect, was not safe or suitable for infant sleep, and could and has caused infants to be placed in dangerous sleep positions, suffocate, and die. Rather than disclose this information, Defendants, through its Safety Representations and Omissions, *inter alia*, marketed the Product as safe and suitable for infant sleep.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

338.    A reasonable manufacturer, distributor, or seller of the Products, under the same or similar circumstances, would have warned of the danger or instructed on safe use of Product.

339.    Defendants did not warn of the particular risks associated with the Products as detailed above, for reasons which fell below the acceptable standard of care, *i.e.*, what a reasonably prudent manufacturer would have known and warned about.

340.    As such, Defendants breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of the Product, in that Defendants manufactured, marketed, promoted, and sold the Product with the uniform Defect, knew or had reason to know of the Defect inherent in the Product, knew or had reason to know that an infant's use of the Product created a significant risk of serious injury and death and is unreasonably dangerous for infants, and failed to prevent or adequately warn of these risks and injuries.

341.    In breach of its duties, Defendants negligently:

    a.    Failed to design, manufacture, formulate, and package the Product without the uniform Defect;

    b.    Designed, manufactured, and formulated the Product such that it contained the uniform Defect;

    c.    Failed to conduct adequate research and testing to determine the extent to which the Product was likely to cause infants to be placed in dangerous sleep positions; and

    d.    Failed to warn that the Product could and has caused infants to be placed in dangerous sleep positions, suffocate, and die.

342.    Despite an ability and means to investigate, study, and test the Product and to provide adequate warnings, Defendants have failed to do so. Indeed,

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety of the Product.

343.    Defendants were negligent in the following respects:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing the Product without thorough and adequate pre-and post-market testing;

b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing the Product while negligently and/or intentionally concealing and failing to disclose the results of trials tests, and, consequently, the risk of serious injury and death associated with use of the Product;

c.    Failing to undertake sufficient studies and conduct necessary testing and adverse event analysis to determine whether the Product was safe for its intended use, infant sleep;

d.    Failing to use reasonable and prudent care in the design, research, manufacture, and development of the Product to avoid the risk of serious harm and death to infants associated with the prevalent use of the Product for infant sleep;

e.    Failing to provide adequate instructions, guidelines, and safety precautions to those consumers who Defendants could reasonably foresee would use the Product;

f.    Failing to disclose to Plaintiff, Class Members, users/consumers, and the general public that use of the Product presented risks or serious injury of death to infants;

g.    Failing to warn Plaintiff and Class Members, consumers, and the general public that the Product's risk of harm was unreasonable

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

and that there were safer and effective alternative infant sleeper available to Plaintiff and other consumers;

h. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence the Defect uniformly present in the Product;

i. Representing that their Product was safe for its intended use when, in fact, Defendants knew or should have known that the Product was not safe for its intended purpose;

j. Failing to make and/or submit any changes to the Product's labeling or other promotional materials that would alert the consumers and the general public of the risks of the Product;

k. Advertising, marketing, and recommending the use of the Product while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of the Product;

l. Continuing to disseminate information to its consumers, which indicates or implies that Defendants' Product is safe and suitable for infant sleep; and

m. Continuing the manufacture and sale of its products with the knowledge that the Product was unreasonably unsafe and dangerous to infants.

344. Defendants knew, or otherwise should have known, that it was foreseeable that consumers' infants, including Plaintiff's and the other Class Members' infants, would be placed at risk of serious injury and death as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of the Product.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

345.   Plaintiff and the other Class Members did not know the nature and extent of the injuries that could result from the intended use of the Product.

346.   Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff and the other Class Members suffered, as described herein, including the injuries suffered by Plaintiff's and the other Class Members' infants.

347.   Defendants' failure to warn or instruct was a substantial factor in causing Plaintiff and other Class Members' harm.

348.   Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of the Product, including Plaintiff and the other Class Members and their infants, with full knowledge of the dangers of the Product. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff and the other Class Members. Defendants' reckless conduct therefore warrants an award of aggravated or punitive damages.

349.   As a direct and proximate result of Defendants' wrongful acts and omissions in placing the defective Product into the stream of commerce without adequate warnings of the risks of serious injury and death to infants, Plaintiff and the other Class Members have been damaged and their infants have been placed at risk of serious injury and death.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests that this Court:

   a.   Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as Class Representatives and appointing the undersigned counsel as Class Counsel;

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

b.     Ordering payment of actual and punitive damages, restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiff and the Class Members as a result of Defendants' unlawful, unfair and fraudulent business practices;

c.     Ordering injunctive relief as permitted by law or equity, further permanently enjoining Defendants from continuing the unlawful practices as set forth herein, issuing a state-of-the-art notice program for the wide dissemination of a factually accurate recall notice for the Products and the implementation of a corrective advertising campaign to alert caregivers to the dangers of inclined swings marketed for infant sleep, including the Product, and educating them about the standards for safe infant sleep by Defendants, and an offer to replace the Product with a reasonable and safe infant product;

d.     Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Classes;

e.     Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

f.     Ordering such other and further relief as may be just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

DATED:  October 24, 2024

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC

*/s/ Alex Straus*
Alex Straus (SBN 321366)
astraus@milberg.com
280 S. Beverly Drive, PH Suite
Beverly Hills, CA 90212
Telephone:  (866) 252-0878
Facsimile:  (865) 522-0049

Rachel Soffin*
*rsoffin@milberg.com*
3833 Central Avenue
St. Petersburg, FL 33713
Telephone:  (866) 247-0080
Facsimile:  (865) 522-0049

Harper T. Segui*
*hsegui@milberg.com*
825 Lowcountry Blvd., Suite 101
Mt. Pleasant, SC 29464
Telephone:  (919) 600-5000

Erin Ruben*
Thomas Pacheco
*eruben@milberg.com*
*tpacheco@milberg.com*
900 W. Morgan St.
Raleigh, NC 27603
Telephone:  (212) 946-9305

Kelsey Gatlin Davies*
*kdavies@milberg.com*
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone:  (865)247-0080
Facsimile:  (865)-522-0049

- 82 -

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LAUKAITIS LAW LLC**

Kevin Laukaitis*
*klaukaitis@laukaitislaw.com*
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Telephone: (215) 789-4462

*Attorneys for Plaintiff & Proposed
Classes*

*\*Pro hac vice application forthcoming.*

CLASS ACTION COMPLAINT
SEEKING STATEWIDE OR NATIONWIDE RELIEF